ATTORNEY FOR APPELLANT
Darlene Robinson
Oakland City, Indiana

ATTORNEYS FOR APPELLEE
Kenneth J. Yerkes
Paul L. Jefferson
Hannesson I. Murphy
Indianapolis, Indiana

ATTORNEY FOR AMICUS CURIAE
INDIANA CHAMBER OF COMMERCE, INC.
William M. Waltz
Indianapolis, Indiana

ATTORNEYS FOR AMICUS CURIAE
INDIANA LEGAL FOUNDATION, INC.
Bryan H. Babb
Gregory W. Guevara
Indianapolis, Indiana

ATTORNEY FOR AMICUS CURIAE
INDEPENDENT COLLEGES OF INDIANA, INC.
Anthony C. Maidenberg
Indianapolis, Indiana

# In the
# Indiana Supreme Court

**FILED**
Nov 13 2012, 10:02 am
CLERK
of the supreme court,
court of appeals and
tax court

No. 82S01-1204-PL-235

JOHN HAEGERT,

*Appellant (Plaintiff below),*

v.

UNIVERSITY OF EVANSVILLE,

*Appellee (Defendant below).*

Appeal from the Vanderburgh Superior Court, No. 82C01-0508-PL-664
The Honorable Douglas J. Knight, Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 82A01-1008-PL-369

**November 13, 2012**

**David, Justice.**

An encounter between a tenured professor at a private university and his department head turned into a formal complaint of harassment against the professor. After extensive internal proceedings, the professor's tenure was rescinded and he was dismissed from the university's faculty. He filed suit claiming breach of his employment contract and tenure agreement, and the trial court granted summary judgment in favor of the university. We affirm.

## I.    Facts and Procedural History

John Haegert joined the University of Evansville's faculty in 1979 and received his tenure in 1982 as a professor in the English Department. Margaret McMullan, a creative writing professor, chaired the English Department from 2000 to 2005.[1] On August 25, 2004, McMullan was in the English Department lounge interviewing a prospective student and her parents. Haegert walked into the lounge accompanied by a female student, said "Hi, Sweetie" to McMullan, walked up to her—standing with his belt buckle at her eye-level, about a foot from her face—and stroked his fingers under her chin and along her neck.

As will be explained in greater detail below, this encounter triggered a formal complaint by McMullan against Haegert through the University's disciplinary review process. The outcome of that process was Haegert's dismissal from the University, two lawsuits, and this appeal.

---

[1] McMullan joined the faculty in 1990, was named acting Department Chair in 2000, and was promoted to permanent Department Chair in 2003. She voluntarily stepped down from the position in 2005 to focus on writing novels.

## A. *Haegert's Employment Contract*

The terms of Haegert's appointment were, like all other tenured professors, governed by a yearly tenure contract with the University. Haegert's tenure contract for the 2004–2005 academic year, executed on March 30, 2004, incorporated by reference the University's Faculty and Administrator Manual ("Faculty Manual"), containing various University policies, terms, and conditions. The Faculty Manual also incorporated a number of national academic standards drafted by the American Association of University Professors and others (collectively, the "AAUP Guidelines").

Under his contract, Haegert agreed "to perform the duties in accordance with standards of performance established by the University and to abide by and to fulfill all duties, responsibilities, and obligations imposed by the Board's governing rules or by the University." (App. at 448.) Failure to do so would be considered "cause for the University to terminate the appointment." (App. at 448.) Of particular importance to this case are several provisions within the Faculty Manual expressing the University's policy (and corresponding disciplinary procedures) with respect to harassment and sexual harassment.

Harassment is defined by the Faculty Manual as "verbal or physical conduct which has the intent or effect of unreasonably interfering with the individual's or group's education and/or work performance, or creating an intimidating, hostile, or offensive educational and work environment on or off campus." (Supp. App. at 127.) The Faculty Manual's definition of sexual harassment is a variation of that used by the Federal Equal Employment Opportunity

Commission (EEOC) and incorporates two forms of sexual harassment:  quid pro quo and hostile environment.[2]  In the latter regard, sexual harassment is defined as:

> [A]ny unwelcome sexual advance, request for sexual favors, reference to gender or sexual orientation, or other verbal or physical conduct of a sexual nature when:
>
> * * *
>
> 2.  Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or educational experience, creating an intimidating, hostile, or offensive working or academic environment and when this conduct has no germane or legitimate relationship to the subject matter of a course.

(Supp. App. at 129.)  In short, a "[h]ostile environment occurs when unwelcome sexual conduct from any employee, student, or faculty member interferes with job or academic performance or creates an intimidating, hostile or offensive work or learning environment."  (Supp. App. at 129.)  Examples of sexual harassment identified in the Faculty Manual include:

- Physical assault

- Unwelcome sexual advances, including unwanted touching, flirting, fondling, hugging, patting, pinching, or leering

- Verbal abuse or degrading propositions of a sexual nature including sexually-oriented jokes, kidding or teasing

- A sexually suggestive environment that interferes with the accomplishment of studies or work

---

[2] Haegert asserts that the University "specifically *adopted* the definition of sexual harassment as formulated by the EEOC."  (Appellant's Br. at 21 (emphasis added).)  This is not correct.  The Faculty Manual makes clear that "[t]he definition of sexual harassment as formulated by the EEOC has been *adapted* for our educational environment."  (Supp. App. at 128 (emphasis added).)  This may perhaps explain why Haegert seeks to apply case law arising from EEOC claims; case law that, as we discuss below, is irrelevant to the issue at hand.

4

(Supp. App. at 130.) Despite the more detailed definition of sexual harassment and particular examples provided, allegations of both harassment and sexual harassment are investigated and adjudicated using the same procedures outlined in the Faculty Manual.

These procedures begin with a recommendation to pursue informal resolution of the complaint; ideally with direct communication between the complainant and the alleged harasser. This is to avoid formal intervention on matters that may arise from mere misunderstanding, ignorance, or misinterpretation. However, "[a] complainant is not required to seek informal resolution to complaints prior to seeking a formal resolution." (Supp. App. at 131.)

A person seeking to file a formal complaint of harassment must do so within 180 days of the most recent alleged conduct. Such a complainant is advised to consult the University's Affirmative Action Officer (AAO)[3] or a policy coordinator[4] and discuss what happened, whether investigation is warranted, and the complaint procedure. If the complainant elects to proceed, a formal complaint is filed by providing the AAO or policy coordinator with a signed, written complaint containing the allegations and requesting an investigation.

When the alleged harasser (now the respondent) is a faculty member, the AAO is to convene a review committee to investigate the complaint, chaired by the AAO and including the faculty ombudsperson, a representative of the appropriate staff or administrator group, and a policy coordinator. The committee is charged with investigating the complaint to determine (1) whether the conduct occurred as alleged; and (2) whether that conduct constitutes harassment.

---

[3] The AAO "is the University official legally responsible for the investigation of harassment charges." (Supp. App. at 128.)

[4] "Policy coordinators serve as a resource to assist the AAO, complainant, and other individuals through the investigation process. The Vice President for Academic Affairs and the Chief Student Affairs Officer serve as policy coordinators." (Supp. App. at 128.) Policy coordinators also investigate complaints when the AAO is unavailable to do so.

5

The Review Committee has thirty days to complete its investigation and review, after which the AAO provides the President of the University with a written recommendation that either there is, or is not, sufficient evidence supporting the alleged violation.[5] These findings and recommendation shall also be sent to the complainant and respondent. If the alleged conduct is found to have occurred and constitute harassment, the AAO "will impose formal sanctions in accordance with University policy." (Supp. App. at 135.) These may include, without limitation, a formal warning, suspension, or termination. "Every precaution will be taken to ensure that the harassment is stopped immediately." (Supp. App. at 135.)

Faculty members have a right to an appeals process by way of a written appeal to the Faculty Appeals Committee (FAC).[6] The FAC will go over the Review Committee's proceedings, call witnesses (if necessary) to provide further information, and make a written recommendation to the AAO and President as to its findings within thirty days. Whether an appeal is sought or not, the President's decision will be communicated, in writing, to both the complainant and respondent.

The Faculty Manual also provides an additional procedure specifically for when dismissal of a tenured faculty member is considered. In such cases, the Faculty Professional Affairs Committee (FPAC)[7] will conduct an "informal inquiry" into the matter and "determine whether in its opinion dismissal proceedings should be undertaken, without its opinion being

---

[5] Or, alternatively, that the parties involved have settled.

[6] The FAC serves as "an appeals board for all cases concerning the well-being of faculty members in accordance with AAUP [American Association of University Professors] Guidelines." (Supp. App. at 107.) It consists of a full-time faculty member from each Academic Governance Unit, elected from the tenured faculty, and a Chairperson appointed by the Faculty Senate's Executive Committee.

[7] The FPAC is a standing faculty committee "responsible for all matters concerning the professional employment, evaluation, and development of faculty." (Supp. App. at 108.) Like the FAC, it consists of a full-time faculty member from each Academic Governance Unit and a Chairperson; it also has as a non-voting member the Vice President for Academic Affairs.

binding upon the President." (Supp. App. at 165.) Any dismissal following this inquiry is preceded by a statement of reasons, and appeal may be had to the FAC. "The President, however, will normally not reach a decision until the Vice President for Academic Affairs and the Faculty Appeals Committee have made their recommendations." (Supp. App. at 165.)

As a final resort, the faculty member can submit a request to the University's Board of Trustees, asking for its consideration. The Board of Trustees studies "all pertinent information" and decides whether to uphold or reverse the appeal. (Supp. App. at 166.)

### B. McMullan's "Anecdotal File"

Haegert's August 25, 2004, encounter with McMullan was not the first instance in which his conduct had been complained of, investigated, or addressed—and for similar circumstances. In early 2002, both McMullan and the University's AAO, Jennifer Graban, received independent informal complaints from several female students expressing concern about Haegert's behavior towards women.[8] These complaints all followed the same themes: derogatory comments about women, explicit commentary, and inappropriate touching. The complainants particularly referenced his use of words like "Sweetie," "Honey," "Babe," and "Hon"; called his language "crude and scary"; and said they felt uncomfortable when Haegert would hug them or other female students. (App. at 353, 354, 357, 364, 366–68.)

Graban asked McMullan to meet with Haegert concerning his behavior, and McMullan did so. During this meeting, McMullan advised Haegert that several students had reported feeling uncomfortable when he touched them or other female students, and that the behavior had

---

[8] Graban became aware of the complaints after being approached by the Faculty Ombudsman, who reported speaking to a faculty member claiming to have overheard complaints made by students about Haegert.

to stop. Haegert responded that he was "not a molester" or "a dirty old man," and that he had "a very rich, very fulfilling sex life." (App. at 133, 401.)

After he left the meeting with McMullan, Haegert went to see Graban, who also cautioned him against touching or hugging his students because it was making students uncomfortable. According to Graban, Haegert was very agitated, angry, and loud. He admitted to using terms like "Hon" and "Sweetie" in addressing female students, but insisted it was part of his personality. (App. at 43.) He again reiterated that he was not a molester or dirty old man and had no intention of altering his teaching style, but Graban advised him that this language could offend people. Haegert concluded the meeting by saying "Thank you, Sweetheart." (App. at 58.)

McMullan received a formal complaint from a different student later that month, alleging the same behavior from Haegert. McMullan forwarded the complaint to Graban, but ultimately the student opted to withdraw the complaint and not renew it.[9] Graban advised Haegert of this complaint in August of 2002, but Haegert again appeared unreceptive to changing his behavior.

McMullan kept notes on all of these complaints—along with notes of other encounters she personally had with Haegert—in what came to be referred to as her "anecdotal file" on Haegert. The file included any information she deemed important in her evaluation of faculty in the English Department, including negative incidents, awards, grants, and letters. She kept such a file on every member of the faculty that she evaluated.

---

[9] The student was a senior and indicated to Graban that she was concerned for the grade she might receive from Haegert if she pursued a formal complaint; after she graduated, the student indicated that she just wanted to move on from the University and not revisit the issue.

### C. The Road to Haegert's Termination

The August 25, 2004, encounter was the last straw for McMullan. She felt like the time had come to file a formal complaint; that Haegert's behavior was not going to change despite warnings from herself and Graban. Furthermore, this encounter had occurred in front of a prospective student and her parents—independent witnesses who could corroborate the conduct and its impact.

McMullan first went to Stuart Dorsey, the Vice President of Academic Affairs, and informed him that she wished to file a formal complaint. She subsequently emailed Dorsey and Jean Beckman, Dean of the College of Arts and Sciences, with a summary of the encounter and her complaint. Later that evening, she forwarded the email to Graban in accordance with the formal complaint provisions in the Faculty Manual, requesting an investigation. The next morning, McMullan met with Graban and Dorsey. Graban typed out the formal complaint as McMullan recounted the events, McMullan made changes to the draft complaint, and she then signed the final version.

The final "Complaint of Harassment" stated the following allegation of misconduct:

> While talking with a prospective student and her parents here in the English department offices, I just had what I consider a disturbing encounter with John Haegert.
>
> I was well into (in the middle of) my visit with the prospective family when John (Haegert) came in to the waiting area. He said very loudly to me, "Hi Sweetie," and he came over and touched and moved his fingers on my neck and chin in a tickling gesture for a long moment while I was addressing the prospective family. This embarrassed everyone in the room. No one said a thing—the prospective family, the one freshman sitting there (a girl) and the girl student who walked in with John. . . .
>
> The prospective student's father cleared his throat and said they had to be going. I had 20-30 minutes left with them. The meeting was over. In my opinion, they will not be sending their daughter to UE and she wants to come.

> This behavior is unacceptable and cannot happen again.

(App. at 474 (emphasis in original).)  Dorsey informed Haegert of the formal complaint and relieved him of his teaching duties, placing him on administrative leave with pay and enjoining him from coming onto campus without an escort until the complaint was resolved.  He also provided Haegert a copy of the complaint and the University's harassment policy.

Graban immediately commenced an investigation, beginning by contacting the family of the prospective student present during the encounter.  The prospective student's father described Haegert's conduct as "fondling under [McMullan's] chin. . . . tickling her."  (Supp. App. at 13, 16.)  He was "shocked," felt the behavior was "inappropriate," and said "[i]f you were in a break room together and you walked in, you would have wondered what had been going on."  (Supp. App. at 13, 16.)  He "thought that he was probably a pig . . . a lousy guy . . . the guy was just a pig."  (Supp. App. at 13, 16 (emphasis in original).)  He also said "[i]t was obvious that Ms. McMullan was extremely uncomfortable with the contact."  (Supp. App. at 16.)

Graban then assembled a three-person Review Committee consisting of herself, the Faculty Ombudsman, and a neutral faculty member.  The Review Committee called McMullan and Haegert as witnesses, but neither McMullan nor Haegert was permitted an advocate at this stage.

McMullan recited the details of the encounter as presented in her complaint; she described the touch as lasting for a "lingering or long moment," and said she was "embarrassed and humiliated."  (Supp. App. at 14.)  In response to questions from the committee, she stated that this was not her first such encounter with Haegert and recited several prior occasions where his conduct or comments made her feel uncomfortable.  At some point around this time, McMullan provided Graban with her anecdotal file.

For his part, Haegert testified that he "regarded the greeting as harmless, inconsequential, very brief, and that certainly—certainly it did not meet the seriousness with which the University

10

was apparently taking [the] matter." (App. at 100.) He said that McMullan had given him a warm greeting and he was in an "extremely joyous" mood that day, but did not deny his words or actions. (App. at 100; Supp. App. at 17.) In fact, he demonstrated by rubbing Graban's left cheek/chin. He also recalled McMullan's and Graban's February and August 2002 warnings, but "his feeling was that it is not really a problem." (Supp. App. at 17.)

On September 15, 2004, the Review Committee submitted its report to the University President, Dr. Stephen Jennings. After summarizing the evidence, the report concluded that "based on the incident that took place on August 25, 2004, as stated in the complaint, the behavior described is in violation of the University of Evansville sexual harassment policy." (Supp. App. at 9.) The Review Committee also found "sufficient evidence supporting the alleged violation." (Supp. App. at 9.) The report enclosed summaries of the testimony, the prospective student's family's account, and the complaint. It also included a number of other items as additional exhibits, including McMullan's anecdotal file and Graban's notes from her meetings with Haegert in February and August 2002. No dissenting votes were indicated.

Jennings then attempted to resolve the situation informally by meeting with Haegert. Jennings indicated to Haegert that there was a strong possibility that he would seek termination through the FPAC, and offered Haegert the option of an early retirement instead. Haegert declined Jennings's offer.

On November 18, 2004, Jennings spoke before the FPAC[10] as "an informal consultation by the administration regarding the potential dismissal of a tenured faculty member." (App. at 218–19.) Jennings was considering—but had not yet decided upon—dismissal of Haegert and planned to recommend this sanction to the FPAC. His determination was based on this not having been the first instance of Haegert acting inappropriately, the nature of McMullan's

---

[10] No member of the FPAC had served on the earlier Review Committee.

11

supervisory relationship with Haegert, and an assessment that Haegert's behavior had created a hostile environment for McMullan, other faculty, and students within the English Department.

The FPAC also heard testimony from Graban, who provided the members with copies of McMullan's anecdotal file. Dorsey also testified and recommended dismissal. McMullan did not testify or provide any statement beyond what was already contained in the Review Committee's report, but Haegert submitted a lengthy email to the FPAC in his defense. In it, he lodged a number of procedural complaints but raised no substantive defenses to his conduct.

The FPAC concluded that "this case does clearly meet the definition of sexual harassment, that procedures had been followed correctly, and that the University must uphold a high standard of conduct." (App. at 465.) "Since there is an unambiguous finding of sexual harassment, and since other efforts at resolution have failed, the committee concludes that University policy has been followed and that the facts of this case constitute adequate cause for dismissal." (App. at 465.)[11]

Following the FPAC's conclusion, Jennings decided to dismiss Haegert from the University faculty, effective December 31, 2004. Jennings cited Haegert's "violation of the University's Sexual Harassment Policy" as having "irreparably damaged your capacity to serve the Department of English as well as the University as a teacher and a colleague." (App. at 454.) Jennings also notified Haegert of his right to appeal the termination decision to the FAC.

---

[11] This language was modified in a formal resolution, concluding that the FPAC "concurs with the findings of the Review Committee Report's conclusion (dated 9, September, 2004.) that there is an unambiguous finding of sexual harassment, and since other efforts at resolution have failed, this Committee, serving in an informal, advisory capacity, concludes that the facts of this case constitute an adequate cause for the initiation of formal dismissal procedures." (App. at 386.)

Haegert chose to appeal the findings of sexual harassment and his termination to the FAC. A hearing before the FAC was scheduled for March 23, 2005. Four months prior to the hearing, Haegert was provided with all of the material reviewed by the FPAC prior to its finding—including McMullan's anecdotal file.

The FAC hearing was a formal hearing, with both Haegert and the University represented by counsel; both sides were permitted to submit opening and closing statements, call and cross-examine sworn witnesses, and present evidence. The committee members were also permitted to ask questions. To the extent they arose, evidentiary issues were resolved by an independent attorney retained by the FAC, and the hearing was transcribed.

A total of eight witnesses were called: McMullan, Haegert, Graban, Dorsey, the student who was with Haegert on August 25, 2004, and also Deborah Howard, Larry Caldwell, and William Pollard. Haegert also introduced a number of letters of support from different individuals.

Graban, Dorsey, and McMullan all presented testimony consistent with the evolution of the complaint procedure thus far. The student testified that Haegert was in high spirits that day, and said "hello" to McMullan, but could not recall anything about the encounter beyond that "because [she] didn't see it or because it was not something that struck [her] as unusual." (App. at 630, 632.) She said that she had seen Haegert greet people in similar fashions, including using similar language; she also testified in support of Haegert's character as a professor. (App. at 631–32.)

Howard, the Chair of the University's Department of Law, Politics, and Society, testified as to the development of the University's sexual harassment policy. Caldwell, President of the AAUP's University of Evansville Chapter, presented testimony tending to undermine McMullan's credibility and motives and bolster Haegert's credentials. Pollard, a former professor in the University's English Department, presented similar testimony. Haegert testified as he had previously: that he was in an exceptional mood that day and had no ill intent toward

13

McMullan, but he did not deny the conduct occurred as described. McMullan's anecdotal file was *not* introduced into evidence.

The next day, the FAC transmitted a letter to Jennings finding that Haegert "is guilty of sexual harassment as defined by the University Faculty and Administrator Manual." (Supp. App. at 276.) It unanimously concurred in Jennings's decision to terminate Haegert, but recommended a severance agreement be offered.[12] On March 29, 2005, Jennings sent Haegert another letter restating the termination for cause, denying application for emeritus status, and permanently banning Haegert from University property and University functions. He informed Haegert that he had the right to appeal to the University's Board of Trustees.

Haegert submitted a written brief to the University's Board of Trustees, raising his procedural grievances, alleging "a cynical use of alleged sexual harassment as the means to eliminate Professor Haegert's dissenting voice and reconfigure the department in favor of Creative Writing," and denying that he had any sexual intent towards McMullan on August 25, 2004; but he again did not deny that the encounter occurred. (Supp. App. at 361–67.) He enclosed a number of letters of support from both faculty and students. The University submitted a responsive brief that included the complaint, all findings and recommendations from the Review Committee, the FPAC, and the FAC. It included the evidence presented to the Review Committee, but did *not* include McMullan's anecdotal file.

The Board of Trustees' Executive Committee denied Haegert's appeal. It considered "the relevant documents, the Faculty Appeals Committee hearing transcript, the President's letter of termination, and [the parties'] well-written briefs." (Supp. App. at 279.) Based on that review, it upheld the FAC's decision and concurred with Haegert's dismissal. "John Haegert received substantial due process with the procedures adopted by the University community and

---

[12] Haegert rejected this severance package.

14

obviously engaged in harassment in violation of the Harassment Policy agreed upon by the faculty." (Supp. App. at 279.)

### D. Haegert's Litigation

On August 25, 2005, Haegert filed a complaint against the University of Evansville, alleging multiple breaches of his employment contract.[13] He also filed a complaint against McMullan, alleging defamation, tortious breach of his employment contract, and intentional infliction of emotional distress. See Haegert v. McMullan, 953 N.E.2d 1223 (Ind. Ct. App. 2011). Parties filed motions for summary judgment in both actions, and the trial court consolidated the two cases for oral arguments.

The trial court granted the University's motion for summary judgment and denied Haegert's.[14] The Court of Appeals reversed, concluding that the University failed to carry its burden of proof with respect to the sexual harassment complaint. Haegert v. Univ. of Evansville, 955 N.E.2d 753, 760 (Ind. Ct. App. 2011), reh'g denied. Specifically, the court looked to a pair of California cases tending to show that a plaintiff filing a claim against an employer for sexual harassment must show that the harassing behavior was pervasive or severe in order for the claim to be actionable as a hostile work environment. See id. at 761–62. It found this showing was not made in Haegert's case "by clear and convincing evidence." Id. at 762.

Judge Vaidik dissented, believing that the University *had* shown, by clear and convincing evidence, that Haegert's conduct on August 25, 2004, constituted a single incident of sexual

---

[13] At different points in his complaint, Haegert labels the breaches as "tortious breach." (App. at 20–21.) However, Indiana does not recognize a distinct cause of action for "tortious breach of contract." See Allstate Ins. Co. v. Hammond, 759 N.E.2d 1162, 1166 (Ind. Ct. App. 2001).

[14] It also granted McMullan's motion on all counts. See McMullan, 953 N.E.2d at 1229. The Court of Appeals affirmed in a separate opinion. Id. at 1226.

15

harassment, and furthermore, under the terms of Haegert's employment contract, no greater showing was needed to support his dismissal. Id. at 762–65 (Vaidik, J., dissenting). We granted transfer, 967 N.E.2d 1033 (Ind. 2012) (table), thereby vacating the decision of the Court of Appeals, Ind. Appellate Rule 58(A).

## II.    Standard of Review

The grant of summary judgment is only appropriate when the moving party affirmatively shows that there are no genuine issues of material fact with regard to a particular issue or claim. Ind. Trial Rule 56(C); Town of Avon v. W. Cent. Conservancy Dist., 957 N.E.2d 598, 602 (Ind. 2011). If this burden has been met, the non-moving party must come forward with designated evidence showing that a genuine issue of material fact does exist. Id. All designated evidence and reasonable inferences are viewed in a light most favorable to the non-moving party; any doubts are resolved against the moving party. Id.

An appellate court reviews these cases through the same lens. We will affirm an award of summary judgment on any theory supported by the record. Woodruff v. Ind. Family & Soc. Servs. Admin., 964 N.E.2d 784, 790 (Ind. 2012). When the facts are undisputed, reversal is only appropriate if the trial court incorrectly applied the law to those facts. Id.

## III.    Discussion

At the outset, we emphasize that this is not a case in which an employee is suing his or her employer based on allegations of discrimination on the basis of sex or cultivating a hostile work environment through the tolerance of sexual harassment. This case is properly defined as

involving an employee fired by his employer pursuant to terms, procedures, and policies laid out in his employment contract. As such, cases applying Title VII of the Civil Rights Act of 1964—or state-law equivalents—do not constitute an appropriate legal foundation for its resolution.[15] Instead, our rules governing the construction, interpretation, and breach of contracts govern this action, and we will go outside the terms of the relevant contract only when absolutely necessary.

"Indiana courts recognize the freedom of parties to enter into contracts and, indeed, presume that contracts represent the freely bargained agreement of the parties." Fresh Cut, Inc. v. Fazli, 650 N.E.2d 1126, 1129 (Ind. 1995). Thus, when the terms of a contract are drafted in clear and unambiguous language, we will apply the plain and ordinary meaning of that language and enforce the contract according to those terms. Sheehan Const. Co., Inc. v. Cont'l Cas. Co., 935 N.E.2d 160, 169 (Ind. 2010). This approach best effectuates the primary goal in appellate review of contract cases: "to ascertain and give effect to the mutual intention of the parties." Hutchinson, Shockey, Erley & Co. v. Evansville-Vanderburgh Cnty. Bldg. Auth., 644 N.E.2d 1228, 1231 (Ind. 1994). This also makes contract cases particularly suited for summary judgment.

To prevail on a claim for breach of contract, the plaintiff must prove the existence of a contract, the defendant's breach of that contract, and damages resulting from the breach. Neither party disputes the existence of Haegert's employment contract or its contents, but Haegert claims the University breached its contract by rescinding his tenure and terminating his employment. He claims damages in the form of lost employment, livelihood, damage to reputation, and physical and mental distress.

---

[15] See, e.g., Haegert, 955 N.E.2d at 761–62 (citing Haberman v. Cengage Learning, Inc., 180 Cal.App.4th 365, 103 Cal.Rptr.3d 19 (2009) and Hughes v. Pair, 209 P.3d 963 (Cal. 2009)); (Appellant's Br. at 21–22 (citing Meritor Sav. Bank v. Vinson, 477 U.S. 57 (1986), Patton v. Keystone RV Co., 455 F.3d 812 (7th Cir. 2006), and Coolidge v. Consol. City of Indianapolis, 505 F.3d 731 (7th Cir. 2007)); (Appellant's Reply Br. at 5.)

Specifically, Haegert claims the University breached his employment contract by: (A) turning McMullan's complaint into a sexual harassment complaint; (B) previously violating a protected right to academic freedom; (C) refusing to allow him to teach after he had been dismissed; (D) depriving him of tenure without the process afforded to him in the contract; (E) terming McMullan's complaint a sexual harassment complaint and then failing to follow the procedure governing sexual harassment complaints; (F) failing to follow the process required for dismissal of a tenured faculty member; (G) restricting his rights as a member of the public to come onto University property or attend University events; and (H) refusing to pay his salary from when he was dismissed until the end of that academic year. (Appellant's Br. at 14–20.)

Aside from a few miscellaneous issues, we view this panoply of allegation as distilling into two primary (and significant) points of contention: (1) was Haegert's conduct on August 25, 2004, actionable as harassment or sexual harassment, and therefore subject to sanction by dismissal and rescission of his contract; and (2) if so, did the University follow the proper procedures for doing so, as set forth in Haegert's contract.

## A. Preliminary Issues

A few particular claims stand out as not being ultimately dispositive of the primary issues in this case, but nevertheless needing to be addressed. We present them early because they tend to weave in and out of Haegert's more substantive arguments, and might otherwise muddy up a straightforward claim.

### 1. The (Re)Classification of McMullan's Complaint

As an initial matter, Haegert claims the University improperly reclassified McMullan's complaint as one of sexual harassment. (Appellant's Br. at 15, 21.) It is true that McMullan's formal complaint says "Complaint of Harassment," whereas Dorsey's letter to Haegert informing him of the complaint terms it "a formal charge of sexual harassment," and the Review Committee's report is labeled as being in response to "McMullan's Complaint of Sexual

18

Harassment." Nevertheless, we fail to see how this constitutes a breach of Haegert's employment contract.

Haegert says this matters because McMullan could not claim quid pro quo sexual harassment as she was his superior, and also that "McMullan could make no claim of a sexually hostile environment since she had only an isolated incident that he touched her under the chin." (Appellant's Br. at 21.) Therefore, he says, he was "accused and found guilty of sexual harassment without any plausible showing of legally actionable sexual harassment or even any complaint that would support such a claim." (Appellant's Br. at 22.) In support of this theory he cites a number of federal cases analyzing Title VII claims. But, as we pointed out above, those cases—and the standards they set forth for defining sexual harassment claims against employers in the civil rights context—are wholly irrelevant to this action. Whether Haegert's conduct constituted sexual harassment—or harassment—such that he could be dismissed is an issue that is properly defined only by the terms of his employment contract, and we answer that question below.

What's more, the terms of Haegert's contract make clear that this is a distinction without any appreciable difference. As the Faculty Manual states, "[h]arassment *of any kind* is unacceptable at the University," and "[s]exual *harassment* is an especially sensitive and problematic *form of harassment*." (Supp. App. at 127–28 (emphasis added).) Just because McMullan's complaint classified Haegert's conduct as being a harassment, and Dorsey's letter and the Review Committee report later classified it as *sexual* harassment, does not mean it is not still harassment.

And regardless, the Faculty Manual states that "the guidelines and procedures for both reporting and investigating *sexual* harassment *are the same* as those for reporting and investigating *any form of harassment*." (Supp. App. at 128 (emphasis added).) Whether these guidelines and procedures were properly followed is likewise discussed below, but there simply is no merit to Haegert's contention that he was denied "the procedure to which he would have

been entitled if there had actually been an allegation of sexual harassment," (Appellant's Br. at 16), because there was no such distinct procedure.

## 2. Haegert's "Right" to Advise Students

Second, Haegert claims that the University had previously violated his right to academic freedom, as it was set forth in his employment contract. (Appellant's Br. at 15.) He claims he sought assistance from the University in putting a stop to "McMullan's campaign against John Haegert's exercise of the academic freedom [the University] promised him," and that "agents" of the University "aided" McMullan in ending Haegert's employment. (Appellant's Br. at 15.) This was apparently motivated by McMullan's difference of opinion "concerning the best direction for the department."[16] (Appellant's Br. at 15.)

The substantive portion of this allegation appears to be that Haegert believed he was entitled to advise students in the English Department by virtue of his tenure contract. However, he points us to no clause or term of the Faculty Manual or his contract which conveys that right, nor could we find one anywhere in the record. A bald assertion that Haegert *thinks* "it is both a right and a responsibility of individual faculty members to advise students," and that the University's failure to provide him with the opportunity to do so is "a violation not simply of [his] academic freedom but also of [his] academic responsibility" is *not* an actionable claim for breach of his employment contract. (App. at 131.)

---

[16] The prior decade had apparently been one of upheaval and schism for the English Department, with some of the faculty aiming to steer the department away from Creative Writing (McMullan's specialty) and towards English Language and Literature (Haegert's specialty). In that regard, the sexual harassment complaint is presented as an attempt to silence a voice for the English Language and Literature assemblage "and to gain thereby a measure of deferred gratification regarding the disputes of a previous epoch." (App. at 577.75.)

20

As to the other side of this allegation—the implication of a nefarious plot, orchestrated by McMullan and aided and abetted by the University, to seize power within the English Department—this likewise has no merit. It ignores that a single, stand-alone action by an individual can be sufficient to constitute harassment and/or sexual harassment and lead to dismissal, regardless of any other influences on (or by) the complainant.

### 3. *Haegert's Campus Ban*

Third, Haegert mentions in several places that he was improperly prohibited from entering onto University property: first in his initial suspension after the filing of the formal complaint, in which he could not enter without an escort, and second in his ultimate termination and permanent ban from University facilities, grounds, and venues. (Appellant's Br. at 16, 20; Supp. App. at 57, 277.) Haegert claims that "the only policy of [the Faculty Manual] that might be used to justify a banishment is the policy on Workplace Violence," and Haegert "was not then, nor later, accused of violent behavior or charged by [the University] or Margaret McMullan with violent behavior." (Appellant's Br. at 16.)[17]

But again, Haegert points to no provision in his employment contract guaranteeing a right of entry onto University property while under investigation for harassment or following termination.[18] There can be no breach of a provision that does not exist. And certainly the University, as a private institution, has the authority to deny entry to individuals who have no

---

[17] This is a facetious attempt to misdirect our attention; nothing in the workplace violence policy discusses bans from University property whatsoever, much less in a way that would lead to a comparison between workplace violence claims and harassment claims.

[18] In fact, the Faculty Manual requires University supervisors to "take necessary corrective action" as soon as they are made aware of potential harassment, (Supp. App. at 131), and the formal complaint procedure requires discussion of "[p]rotection of the complainant against any retaliatory action," (Supp. App. at 132.) Under either of these provisions, a limited-access ban pending investigation might conceivably be appropriate.

contractual interest in the property. See Ind. Code § 35-43-2-2. After his termination, this category of individuals would include Haegert.

### 4. Graban's Notes and the Impact of McMullan's "Anecdotal File"

Fourth, Haegert repeatedly complains that McMullan's anecdotal file was inappropriately used against him. (Appellant's Br. at 15, 16–17, 18, 19, 21, 23–26.) He contends that this file was "largely undated fabrications based on hearsay, double and triple hearsay," that he was not informed of its existence, and thus he was never made aware of all the evidence against him in a way that he could contest it. (Appellant's Br. at 23–25.) He also argues that Graban kept "notes of hearsay reports by unnamed students" who had complained of Haegert's behavior in 2002. (Appellant's Br. at 17.) He says these notes were kept in violation of the Faculty Manual's provisions regarding informal complaints and, like the anecdotal file, were used against him "to fabricate a 'history' of 'sexual harassment,' to find him 'guilty' of sexual harassment, and to have him fired." (Appellant's Br. at 17.)

The Faculty Manual provides that a complainant who is uncomfortable personally confronting an alleged harasser may contact the supervisor for the alleged harasser, who will attempt to resolve the issue informally. "Such informal procedures are to be kept strictly confidential and, in the interests of future confidentiality, the supervisor is not to maintain written records of the discussions." (Supp. App. at 131.) This process applies "provided the supervisor does not serve as either a policy coordinator or as the AAO (in such cases, the University Ombudsman should be contacted)." (Supp. App. at 131.) However, even when a formal complaint is lodged with the AAO, and informal resolution is sought in conjunction with the formal process, that informal resolution is also subject to the confidentiality requirements.

It therefore appears that Haegert is correct, and to the extent Graban and McMullan kept notes regarding the informal resolution of complaints made by students, their doing so violated the Faculty Manual's policy on harassment. However, that Graban and McMullan may have

22

erred does not necessarily turn their misconduct into an actionable breach of Haegert's employment contract.

For one thing, the Faculty Manual's confidentiality provision would not apply to the portions of the anecdotal file containing McMullan's own observations of prior encounters between herself and Haegert, and describing the effect of his conduct on her. For example, the file includes a letter from McMullan to Beckman in which McMullan says Haegert's presence "is disruptive, often threatening, unpleasant, and rude . . . my only alternative to writing this letter is to go ahead and just give [Haegert] a 5 and expect another chuck under the chin," (App. at 409) and "[t]his is 2002. We don't live in a world where teachers can say and do the things [Haegert] says and does." (App. at 410.)

Similarly, a February 2001 notation says Haegert walked up to McMullan, in front of colleagues, and "chucked me under the chin for 3 long beats and said, 'You gave me just the schedule I wanted sweetheart.'" (App. at 422.) There is also a description of a "[v]ery awkward" and "[v]ery uncomfortable" encounter in which Haegert came to McMullan's office, sat next to her, and described his view on a fellow professor's tenure vote by saying "I gotta tell you, I can't support her for tenure, and geez, she's a bitch now, what will she be later?" (App. at 424.) Haegert then said "OK, my dear," and reached over and held McMullan's hand in her lap, then withdrew it, brushing her knee. (App. at 424.)

Nor would the Faculty Manual's provision apply to a record of a 2001 encounter in which McMullan was kneeling to put a letter into a file and Haegert walked over, stood over her, and tousled her hair. She noted that this made her feel "embarrassed that my colleague would do such a thing to another colleague." (App. at 425.)

Likewise, the confidentiality provision would not apply to the portion of the anecdotal file describing incidents in which Haegert demonstrated hostility or disrespect toward students and colleagues. One such example is a 2002 encounter in which Haegert described a student to McMullan as "mine," saying, "[y]es, indeed she was mine my dear. Oh yes, she was mine."

23

(App. at 411.) Another example would be the description of a 1998 dinner attended by a prospective faculty member, McMullan, Haegert, Caldwell, and an administrator. During this dinner, Haegert "kept caressing [the prospective faculty member's] arm. He said, 'How do you teach, my dear? Do you seduce your students? Or are [you (sic.)] more militant? Do you demand.'" (App. at 434.)

There is also a report by another professor that Haegert took him by the collar and pushed him against the wall in front of several students, and one detailing Haegert making a fist during a departmental meeting as if to hit a colleague, and then punching a wall. (App. at 420, 432.). And there is a note about an October 2001 encounter in which Haegert came to McMullan's office, sat at a chair next to her desk, described a student by saying "She's a bitch. A c---." (App. at 423.) Using similar language, Haegert also once described McMullan's Feminine Perspectives class to her as "C--- Lit." (App. at 423.)

All of those portions of the file were perfectly permissible under the Faculty Manual's confidentiality provisions, and all of them—if taken as true—are indicative of a pattern of behavior that would be highly relevant to the University's decision-making process with respect to a proper sanction for Haegert.

Also, it is not clear that the Faculty Manual's confidentiality provision necessarily translates into Haegert's desired exclusionary rule prohibiting admission of that documentation during a subsequent investigation. Rather, the Review Committee "shall have broad access to all potentially relevant documentation," and its proceedings "are not those of a court of law." (Supp. App. at 133.) The FPAC proceeding is similarly "informal," and the FAC proceeding, while formalized, "will not be bound by strict rules of legal evidence, and may admit any evidence which is of probative value in determining the issues involved." (App. at 673.) Certainly nothing in the Faculty Manual or AAUP Guidelines prohibited McMullan or Graban

24

from *testifying* about those events in response to questioning by those panels, and we do not find anything inappropriate about the related documentation being made available to the Review Committee, Jennings, the FPAC, the FAC, and the Board of Trustees.[19]

Finally, to succeed in his claim that McMullan's and Graban's conduct breached his employment contract, Haegert would have to show that this breach was a "substantial factor" contributing to his damages. See Parke State Bank v. Akers, 659 N.E.2d 1031, 1034 (Ind. 1995). But as we discuss in greater detail below, the undisputed evidence shows that the Review Committee did *not* consider the anecdotal file in its deliberation—instead, it based its recommendation entirely off of the testimony provided by the witnesses and assessed only the August 25, 2004, encounter. The same was true at every subsequent proceeding, including the more formalized FAC hearing.

In fact, the University deliberately omitted McMullan's anecdotal file from the FAC hearing because it believed the committee "should hear the evidence for themselves" and not simply review the Review Committee. (App. at 600.)  Instead it was *Haegert*, not the University, who attempted to introduce the contents of the anecdotal file at the FAC hearing. Furthermore, the evidence shows that Jennings, the ultimate decision-maker as to whether Haegert should be dismissed or not, reached his decision based solely on the August 25, 2004, encounter. He believed that particular encounter "reached the level of the magnitude of a serious enough complaint" that dismissal was warranted. (App. at 210.)

---

[19] For that matter, the University is correct in pointing out that at his FAC hearing, Haegert benefited from these loose evidentiary standards as well. Haegert presented, and admitted into evidence, a number of letters and statements from non-testifying individuals—all of which would have been hearsay in a court of law. All of these statements were admitted—like the anecdotal file could have been—in response to the question of whether dismissal was appropriate, not a question as to the validity of the underlying harassment complaint. (App. at 638 ("This is testimony by these people without cross-examination, admittedly without cross-examination, but we are offering it as evidence on the issue of the discharge.").)

Accordingly, to the extent we might assume McMullan's anecdotal file and Graban's notes constituted a breach of Haegert's employment contract, the designated evidence shows that it was not a substantial factor leading to his termination.

## B. Haegert's Actions Violated the Terms of His Employment Contract

With those matters resolved, we move on to the more critical issues. The first question is whether Haegert's conduct constituted harassment or sexual harassment under the terms of his employment contract such that the University could dismiss him.

The Faculty Manual's definition of harassment includes "verbal or physical conduct which has the intent or effect of unreasonably interfering with the individual's . . . work performance, or creating an intimidating, hostile, or offensive educational and work environment on or off campus."  (Supp. App. at 127.)

Sexual harassment includes "any unwelcome sexual advance . . . reference to gender . . . or other verbal or physical conduct of a sexual nature" when "[s]uch conduct has the purpose or effect of unreasonably interfering with an individual's work performance . . . creating an intimidating, hostile, or offensive working or academic environment and when this conduct has no germane or legitimate relationship to the subject matter of a course."  (Supp. App. at 129.)  It specifically includes instances "when unwelcome sexual conduct from any . . . faculty member interferes with job or academic performance or creates an intimidating, hostile or offensive work or learning environment."  (Supp. App. at 129.)  Examples include "[u]nwelcome sexual advances, including unwanted touching, flirting, [and] fondling," as well as "[a] sexually suggestive environment that interferes with the accomplishment of studies or work."  (Supp. App. at 130.)

Here, the designated evidence shows that on August 25, 2004, Haegert entered the English Department lounge while McMullan was interviewing a prospective student and her family.  He walked up to McMullan, touched her neck, chin, or face in some way and for some

26

duration, and said "Hi, Sweetie." The evidence also shows that the encounter offended both McMullan and was viewed as inappropriate by the prospective student's family, to the extent that the family terminated the interview and left the University.

Haegert does not contest that the encounter occurred, and obviously could not contest its impact on McMullan or its perception by others, leaving only the question of whether his actions constituted harassment or sexual harassment under the terms of his employment contract.

To that, Haegert's defense largely revolved around him saying he was simply in a joyous mood that day, and that he viewed the whole matter as harmless or inconsequential. But the Faculty Manual makes clear that it is not only the *intent* behind the conduct that matters, it is also the *effect* of the conduct. In that regard, the record clearly shows that the *effect* of Haegert's verbal and physical conduct unreasonably interfered with McMullan's work and job performance and created an offensive work environment by making her uncomfortable and disrupting the work she was doing trying to recruit a potential student to the University. Moreover, and again irrespective of his intent, his conduct nearly directly mirrors the Faculty Manual's stated examples of what constitutes sexual harassment. This is what every adjudicatory body found throughout Haegert's dismissal process, and there is clear and convincing evidence in the record to support such findings.

Accordingly, there is no genuine issue of material fact as to the question of whether Haegert's conduct on August 25, 2004, was properly found to satisfy both the broad definition of harassment and the more particularized definition of sexual harassment spelled out in his employment contract.

Likewise, there is no genuine issue of material fact that under the express terms of his contract, the spectrum of sanctions available to the University subsequent to a finding of even a single incident of harassment (including sexual harassment) includes termination and dismissal.

## C. Haegert's Dismissal Process Complied With His Employment Contract

The question that remains is whether the University breached Haegert's employment contract by denying him procedural entitlements afforded under the contract's terms. We approach this question by dividing his dismissal process into steps: the filing of McMullan's complaint, the Review Committee proceeding, the FPAC proceeding, the FAC proceeding, and the Board of Trustees proceeding.

### 1. The Filing of McMullan's Complaint

The Faculty Manual provides that a formal complaint is initiated when the complainant files with the AAO a written and signed complaint containing the relevant allegations and requesting a formal investigation. Here, McMullan met with Graban and conveyed her wish to file a formal complaint against Haegert following the August 25, 2004, encounter. Graban typed up the complaint form as McMullan talked, and McMullan made edits as necessary. The final version was completed and signed by McMullan, and submitted to Graban.

Haegert claims that Graban "helped [McMullan] draft her statement which does not allege sexual harassment." (Appellant's Br. at 16.) We have already discussed the irrelevance of the harassment/sexual harassment distinction, and the Faculty Manual does not prohibit the AAO from physically typing the allegations into a University form. Ultimately, what was submitted as the formal complaint was, in fact, a written document, signed by McMullan, containing her allegations and requesting an investigation. Accordingly, there is no genuine issue of material fact as to whether or not the University breached Haegert's employment contract at this stage of his dismissal process. It did not.

### 2. The Review Committee Proceedings

After a formal complaint is filed, the Faculty Manual requires the AAO to convene a committee to review the charge and hear evidence and testimony, chair the committee and

28

coordinate the investigation, inform the complainant and the respondent of the committee's identity, and provide the respondent with a copy of the formal complaint. Neither party may be represented by legal counsel at this stage, but policy coordinators will assist them as needed. The committee's task is to "conduct a thorough investigation of the allegations" in order to determine whether the conduct occurred as alleged and, if so, whether it constituted harassment. (Supp. App. at 133.)

Here, Graban conducted a preliminary investigation by interviewing the prospective student's family. She then convened the Review Committee and it heard testimony from McMullan and Haegert, along with reviewing a written statement from the prospective student's family. Graban had access to McMullan's anecdotal file and offered it to the other members of the Review Committee, but they declined. They did, however, directly question McMullan as to whether this was the first such incident involving Haegert. The Review Committee unanimously found that Haegert's conduct did occur as alleged, and that it constituted sexual harassment.

Haegert first claims that Graban's interview of the prospective student's family was improper as it occurred prior to her convening the Review Committee. (Appellant's Br. at 16.) But the Faculty Manual makes clear that the AAO is "legally responsible for the investigation," and she is the "coordinator of the investigation." (Supp. App. at 133.) Nothing in the Faculty Manual requires her to wait until *after* the Review Committee is convened to begin assembling evidence. In fact the Faculty Manual requires her to "[e]nsure that the investigation is conducted in a timely manner." (Supp. App. at 133.) Specifically, the investigation must be completed within ten days of the formal complaint's filing. (Supp. App. at 133.) In light of these requirements, not only is Haegert's claim unsupported by any term of his employment contract, it seems completely contrary to the objective of the contract: to conduct these types of investigations in an expeditious manner.

Haegert also claims that the Review Committee inappropriately had access to McMullan's anecdotal file, and that the file was not made available to him prior to or during the Review Committee proceedings. (Appellant's Br. at 17.) But the undisputed evidence shows

that though McMullan presented the anecdotal file to Graban, the other two Review Committee members refused to look at it in the course of the proceeding, wanting "to base [their] decision on the incident described here, and that was it." (Supp. App. at 299–300.) And Graban, as AAO, was already aware of the prior complaints from Haegert's students because she was the one who gave him the warnings.

Furthermore, there is nothing inappropriate about Graban offering this evidence to the Review Committee, as the Faculty Manual provides that the Review Committee shall have "broad access to all *potentially* relevant information." (Supp. App. at 133 (emphasis added).) "The proceedings are not those of a court of law." (Supp. App. at 133.) Regardless, it is clear that the Review Committee decided the anecdotal file was *not* regarded as relevant, and the AAO makes available to the complainant and respondent only that documentation "that *is* regarded as relevant to the complaint." (Supp. App. at 133 (emphasis added).)

Haegert also alleges that he "was not assigned a 'policy coordinator' as suggested by [the Faculty Manual]," and that he was denied in his request to have Caldwell represent him at the Review Committee proceedings. (Appellant's Br. at 17.) The Faculty Manual provides that either the complainant or respondent "may choose to have an additional policy coordinator present for support or in the absence of a female policy coordinator, may request another female administrator to be present." (Supp. App. at 133.) "Policy coordinators will assist the complainant and/or respondent through the investigation process as needed." (Supp. App. at 133.)

However, this language does not *assign* a policy coordinator to Haegert as he suggests. Also, the Faculty Manual only names two individuals as policy coordinators: the Vice President for Academic Affairs and the Chief Student Affairs Officer. Only "[i]n special circumstances, such as when a female complainant requests a female coordinator," may the AAO appoint a "special policy coordinator." (Supp. App. at 128.) Caldwell was a Professor of English and President of the AAUP's University of Evansville Chapter, not one of the designated policy

coordinators, and Haegert made no claim of "special circumstance" to justify designation of a "special policy coordinator."

Next, Haegert claims the University improperly denied him access to the Review Committee's report. (Appellant's Br. at 18.) He asserts that he "had not received a copy of the committee report, nor had he been permitted to review it in the office of the AAO since he was, without any cause whatever, temporarily banned from campus on August 26, 2004, under threat of prosecution for criminal trespass, and subsequently banned permanently." (Appellant's Br. at 18.) But the Faculty Manual only requires that the Review Committee's "action or recommendation" be communicated in writing to the complainant, and here Graban sent Haegert a letter on September 16, 2004, notifying him that the Review Committee found sufficient evidence to support McMullan's allegation, that the conduct as alleged constituted sexual harassment, and that the Review Committee forwarded its report to Jennings.

Moreover, while the Faculty Manual does require that the full report, including all available evidence and testimony, be kept on file in the AAO's office, it does not provide a right of access to either the complainant or respondent. Even if it did, Haegert's initial ban from campus was not an absolute ban. It was qualified by prohibiting entry "unless accompanied by security staff," (Supp. App. at 57), and Haegert does not point us to any designated evidence showing that he tried to access the full Review Committee report and was denied.

Haegert also claims that the Review Committee report was submitted to Jennings without a recommended sanction. (Appellant's Br. at 17.) However, this is not required in the Faculty Manual. What the Faculty Manual provides is that "[i]f harassment is found, the AAO/policy coordinator, in consultation with the appropriate administrator, will impose formal sanctions in accordance with University policy." (Supp. App. at 135.) Here, Jennings made the decision to consider termination (if informal resolution proved impossible) after receiving the Review Committee's report from Graban. We think this comports with the Faculty Manual's provisions.

31

Finally, Haegert claims the University denied his right to appeal until after December 9, 2004. (Appellant's Br. at 18.) We take this to mean that he believes he had the right to appeal the Review Committee's recommendation, in addition to his right to appeal Jennings's termination decision. He is probably correct in his interpretation of the Faculty Manual.

After the portion addressing available sanctions, the Faculty Manual's formal complaint procedure provides that "[e]ach respondent has the right to engage in the appeals process. Faculty members may make a written appeal to the Faculty Appeals Committee." (Supp. App. at 135.) It also says that appeals must be completed within thirty days. This language certainly does indicate that a respondent to a harassment complaint has the right to a direct FAC hearing on *any* Review Committee recommendation—and he or she probably has that right exclusive of the right to appeal any subsequent termination dismissal.

Once again, though, Haegert presents no evidence showing he tried to exercise that right and was denied. He was provided a copy of the policies governing harassment complaints and a timely copy of the Review Committee's recommendation but apparently chose not to appeal that recommendation. This decision is not a breach of his employment contract. Accordingly, we again find that there is no genuine issue of material fact as to whether or not the University breached Haegert's employment contract at this stage of his dismissal process. It did not.

### 3. *The FPAC Proceedings*

Haegert's employment contract requires that the FPAC conduct "an informal inquiry" in any case in which a tenured faculty member faces dismissal. (Supp. App. at 165.) The FPAC should "determine whether in its opinion dismissal proceedings should be undertaken, without its opinion being binding upon the President." (Supp. App. at 165.) This coincides with AAUP Guidelines. Here, Jennings informed Haegert that he was considering dismissal and intended to seek the advice of the FPAC. After conducting its inquiry, the FPAC unanimously affirmed the Review Committee's finding of sexual harassment and concluded that dismissal was appropriate.

32

Haegert's complaint with respect to the FPAC proceeding seems to be that he "was not allowed to attend, was not allowed to be represented, and was not told about the fabricated 'evidence' against him [i.e. McMullan's anecdotal file]." (Appellant's Br. at 19–20.) But neither the Faculty Manual nor the AAUP Guidelines provide a faculty member with the right to attend this proceeding, or the right to be represented by anyone in their stead. Nevertheless, Haegert submitted a lengthy email to the FPAC in his own defense, and that email was considered along with the other evidence.

To the extent Haegert is asserting that his anecdotal file was used against him to establish a pattern of misconduct before the FPAC, we do not see the evidence the same way. The FPAC minutes indicate that the committee was aware of the anecdotal file and that it had been available to the Review Committee. But it was also aware that this was not the first instance of Haegert's questionable behavior because the Review Committee had questioned McMullan about that very matter, and that questioning was contained in the Review Committee report.

Regardless, the FPAC determined that "*this case* does clearly meet the definition of sexual harassment," and "the facts *of this case* constitute adequate cause for dismissal." (App. at 465 (emphasis added).) We therefore find that there is no genuine issue of material fact as to whether or not the University breached Haegert's employment contract at this stage of his dismissal process. It did not.

### 4. The FAC Proceeding

According to the Faculty Manual, after the FPAC completes its inquiry and submits its opinion to the University President, any dismissal must be "preceded by a statement of reasons," and the faculty member has the right to be heard by the FAC. (Supp. App. at 165.) The AAUP Guidelines phrase the process as requiring "a statement of charges, framed with reasonable particularity by the president," and also say that "[a] dismissal . . . will be preceded by a statement of reasons and the individual concerned will have the right to be heard initially by [the FAC]." (App. at 672.)

33

The FAC is tasked to "collect evidence, hold hearings, and otherwise inquire into the faculty member's grievance so as to make a written recommendation to the President with regard to the disposition of the case." (Supp. App. at 165.) The AAUP Guidelines require a level of formality at this stage, including representation for the respondent, transcription of the hearing, and the presentation and cross-examination of witnesses. Though strict rules of evidence do not apply, the AAUP Guidelines encourage "[e]very possible effort . . . to obtain the most reliable evidence available." (App. at 673.) The University bears the burden of proof at this proceeding, and must show "by clear and convincing evidence in the record considered as a whole" that adequate cause for dismissal exists. (App. at 673.)

In this instance, after the FPAC rendered its findings to Jennings, affirming the Review Committee's recommendation and concurring with dismissal as a sanction, Jennings notified Haegert in writing of the FPAC's conclusions and that he was therefore dismissed from the University's faculty. Haegert appealed this decision to the FAC, before whom Haegert presented evidence, cross-examined the University's witnesses, and was afforded every procedural right guaranteed by AAUP Guidelines. The FAC unanimously concurred with Jennings's decision.

Haegert argues that "[a]fter dismissal is recommended, the faculty member whose tenure has been revoked has the right to appeal to [the FAC] *prior* to termination." (Appellant's Br. at 19 (emphasis in original).) But in his case, he claims, the University "denied Haegert such appeal instead dismissing him prior to allowing him that appeal." (Appellant's Br. at 19.) Although the Faculty Manual only says that "the President . . . will *normally* not reach a decision until the Vice Pesident for Academic Affairs and [the FAC] have made their recommendations." (Supp. App. at 165 (emphasis added)), the AAUP Guidelines certainly seem to support Haegert's contention that he was entitled to appeal the decision to dismiss him prior to the actual dismissal.

However, Jennings's letter to Haegert notifying him of his dismissal was sent on December 9, 2004, with an effective dismissal date of December 31, 2004; and it expressly noted his right to appeal that decision to the FAC. Haegert in fact availed himself of this right, notifying Jennings of this less than a week later and requesting a FAC hearing prior to December

34

31, 2004. For reasons that are not clear from the record, this hearing was not held until March 2005.

But what *is* clear from the record is that his appeal tolled his actual dismissal. Haegert was maintained on the University payroll until the FAC completed its deliberations and submitted its findings to Jennings. His pay, benefits, and tenured status were maintained until March 31, 2005. The evidence also reflects that a contrary decision by the FAC during this period would have caused Jennings to rescind his dismissal decision. Thus, there is no merit to Haegert's claim that he was denied his right to appeal to the FAC prior to dismissal.

We also find no merit to Haegert's claim that "[a]t no time prior to his dismissal did President Jennings ever inform Haegert in writing of any reason for removal of his tenure and discharge." (Appellant's Br. at 19.) As an initial matter, we point out that neither the Faculty Manual nor the AAUP Guidelines require the University President to be the one to provide a statement of reasons for dismissal. The Faculty Manual requires only that a dismissal be preceded "by a statement of reasons," (Supp. App. at 165), and the AAUP Guidelines require "a statement of charges, framed with reasonable particularity by the president *or the president's delegate*." (App. at 672 (emphasis added).) Regardless, the record reflects that Haegert was provided with the requisite statements on multiple occasions through the process—by President Jennings himself.

First, Jennings's December 9, 2004, letter to Haegert expressly stated that the initiating event for his termination was McMullan's complaint, a copy of which the University had already given to Haegert. The letter references the Review Committee's recommendation to Jennings, a copy of which Haegert had also been provided previously. It then quotes the FPAC's resolution that there was "an unambiguous finding of sexual harassment," and informs Haegert that "[t]he basis for [his dismissal] is that this violation of the University's Sexual Harassment Policy has irreparably damaged your capacity to serve the Department of English as well as the University as a teacher and colleague." (Supp. App. at 418.)

35

Second, Haegert also received a copy of the FAC's March 24, 2005, letter to Jennings, finding Haegert "guilty of sexual harassment as defined by the [Faculty Manual]." (Supp. App. at 419)  This finding was reiterated in Jennings's subsequent letter terminating Haegert's employment effective March 31, 2005.  Thus, Haegert's claim that "at no time" did he receive the required statement of reasons is not supported in any way by the evidence.

Finally, Haegert claims that "[o]n March 25, 2005, [the University] made a public statement that AAUP standards are not relevant to Haegert's case." (Appellant's Br. at 20.)  This appears to be a reference to an interaction between the University's counsel, Thomas Magan, and Haegert's counsel, Virginia O'Leary, at the FAC hearing.  As far as we can understand this argument, the "public statement" came at a time when O'Leary was questioning Caldwell about the procedures applied in Haegert's case and whether they were, in his opinion as AAUP Chapter President, sufficient.  Magan objected, saying

> We're here not to determine how we got here; we're here to make an independent judgment of what's going on.
>
> The procedures are what the procedures are.  We don't have – this guy doesn't – he's not an administrative person; he's not part of any of the faculty committees that have ruled on this.  They've all done what they thought was appropriate, and to have him opine on something just out in left field has nothing to do with anything; or to say what somebody from the AAUP may have said based on whatever he told them, that has nothing to do with it.
>
> The University policies are what we're applying here, not some person remote from here.

(App. at 644.)  O'Leary continued on with her questioning and Magan objected again, and the following interaction ensued:

> MR. MAGAN:  But we all understand, because we've already had testimony on it, it's not what the AAUP says; it's what the faculty decides and puts in their handbook.  They may be informed by what the AAUP suggests; they may adopt an AAUP policy, but it's the University and the internal faculty –what you sign up for when

you sign for tenure is the rules set by your peers in your particular institution, not all institutions. And so these people –

MS. O'LEARY: And the University of Evansville subscribes to AAUP policies.

MR. MAGAN: But it's how they interpret those AAUP policies, not how somebody else interprets those policies.

(App. at 644.) Ultimately, O'Leary's line of questioning was ruled irrelevant by the FAC's independent attorney.

To the extent Haegert is claiming this interaction means the University was refusing to apply the AAUP Guidelines in his case, our review of his dismissal procedures indicates otherwise. The evidence shows compliance with the AAUP Guidelines and the Faculty Manual at every stage of the proceeding. In fact, the above interaction was followed by an interjection from a seated member of the FAC, pointing out that the University "adopted certain AAUP policies. They're in the red book that we've adopted in here, formally adopted. They're in the faculty members' red Faculty Manual. *This hearing really has followed those guidelines. As a matter of fact, it's an extension of those guidelines . . . that are being applied here*." (App. at 645 (emphasis added).)

We find again that there is no genuine issue of material fact with respect to whether the University breached Haegert's employment contract at this stage of his dismissal process. It did not.

### 5. *The Board of Trustees Proceeding*

We arrive at last to the final stage in Haegert's dismissal process: his appeal to the University's Board of Trustees. Both the Faculty Manual and the AAUP Guidelines grant a faculty member the right to file a final appeal to the University's governing board. Haegert exercised this right, submitting a written brief and evidence that the Board of Trustees considered in addition to the record from prior proceedings. It nevertheless found that Haegert

"obviously engaged in harassment in violation of the Harassment Policy agreed upon by the faculty," and denied his appeal. (Supp. App. at 279.)

Haegert has alleged no particularized claims implicating a breach of his employment contract arising from this specific proceeding, and we do not find any of his generalized claims supported by this portion of the record. Accordingly, we find that there is no genuine issue of material fact with respect to whether the University breached Haegert's employment contract at this stage of his dismissal process. It did not.

### D. Haegert Was Afforded Due Process

Finally, we address an issue that underpins and intertwines with Haegert's entire complaint. This is his contention that his tenured-professor status was a property right, and that the University deprived him of that property without affording him the process he was promised.[20] Largely because we find that the University complied with the provisions of Haegert's employment contract, we resolve this issue against him as well.

Because the University is a private institution, it is debatable just how far a formalized due process claim could carry Haegert. See 37 A.L.R. Fed. 601 (1978) (discussing the challenge of discerning Fourteenth Amendment protections available in actions by private institutions of higher education). However, even assuming for the sake of argument that Haegert's dismissal process was subject to the protections of the Fourteenth Amendment, we find its requirements satisfied.

---

[20] Haegert's complaint is styled as a breach of contract, and he raises no independent claim under the Fifth or Fourteenth Amendment.

"The essential requirements of due process . . . are notice and an opportunity to respond. The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement." Cleveland Bd. Of Educ. v. Loudermill, 470 U.S. 532, 546 (1985) (identifying requirements for tenured *public* employee). The employee "is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." Id.

Here, Haegert received notice of McMullan's complaint, and the potential for disciplinary action up to and including dismissal, no later than the day after the complaint was filed. He then had four separate opportunities, before four distinct and neutral panels, to tell his side of the story. Each of these opportunities afforded him the opportunity to present arguments and evidence, both in person and in writing, as to why he did not commit harassment (or sexual harassment), and why dismissal was not an appropriate sanction.

The third of these opportunities—the FAC hearing—was a formalized process with many of the procedural protections afforded to litigants in a court proceeding, and before which he had full access to every aspect of the University's evidence related to the August 25, 2004, encounter *and* McMullan's anecdotal file. And only the last of these four opportunities—the Board of Trustees appeal—was actually post-termination.

Despite all this, he failed to persuade any individual, at any stage of the process. It is hard to imagine what additional process the University might have provided Haegert.

As we have said before, "[a]t least in the context of educational institutions, as long as the process is reasonably transparent and fair and affords the subject an opportunity to respond . . . the ultimate issue focuses less on the particular process and more on the recognition of the institution's interest in assuring a proper educational environment." Hartman v. Keri, 883 N.E.2d 774, 777–78 (Ind. 2008). Certainly Haegert was entitled to the extensive process laid out in his tenure contract, but that process was fully afforded to him and more than adequately provided him with the essential requisites of notice and an opportunity to respond.

## IV.    Conclusion

Accordingly, we affirm the decision of the trial court.

Dickson, C.J., Rucker, Massa, and Rush, JJ., concur.