

ATTORNEYS FOR APPELLANT

Gregory Guevara
Philip R. Zimmerly
Bose McKinney & Evans LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Kyle Hunter
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Advanced Correctional
Healthcare, Inc.,

*Appellant-Petitioner,*

v.

Review Board of the Indiana
Department of Workforce
Development, et al.,

*Appellee-Respondent*

March 3, 2015

Court of Appeals Case No.
93A02-1408-EX-538

Appeal from the Review Board of the
Department of Workforce
Development.
Steven F. Bier, Chairperson.
George H. Baker, Member.
Larry A. Dailey, Member.
Cause No. 14-R-1078

**Baker, Judge.**

[1] Advanced Correctional Healthcare (ACH)[1] appeals the determination of the Review Board of the Indiana Department of Workforce Development (the Board) that M.W., a former employee of ACH, is entitled to unemployment insurance because he was not fired for just cause. Evidence was presented that eleven people from two different employers and five separate work locations had complained about inappropriate sexual comments made by M.W. Despite this evidence, and despite the fact that M.W. did not deny four of the complained-of conversations, the Board found that M.W. had not violated ACH's sexual harassment policy and was not fired for just cause. Finding a lack of substantial evidence supporting this judgment, we reverse.

## Facts

[2] ACH provides healthcare services to county jail facilities throughout Central Indiana. ACH has a Sexual Harassment Policy that is set forth in both the Employee Handbook and in a separate corporate policy document. As summarized by the Administrative Law Judge, the Sexual Harassment Policy provides as follows:

---

[1] As of January 13, 2015, Administrative Rule 9 has been amended. In the past, parties to unemployment compensation proceedings were required to make an affirmative request to remain confidential in court records. *See Recker v. Review Bd. of Ind. Dep't of Workforce Dev.*, 958 N.E.2d 1136, 1138 n.4 (Ind. 2011). The newly amended Rule 9 has a default position of confidentiality such that parties need no longer make an affirmative request in that regard. Ind. Administrative Rule 9(G)(6). The corollary, however, is that the party or person affected by the release of the protected personal information may waive the right to exclude the court record from public access. *Id.* Here, ACH used its own name in its appellate pleadings and did not file any of its briefs or appendix on green paper. Consequently, we find that it has waived the right to have its name excluded from the court record. Because M.W. is not taking part personally in this appeal, we decline to find that he has waived confidentiality and will refer to him by initials.

that certain conduct is expressly prohibited including lewd, off-color, and sexually oriented comments or jokes, and foul or obscene language, and sexually oriented or explicit remarks including written or oral references to sexual conduct, gossip regarding one's sex life, body, sexual activities, deficiencies or prowess, and questions about one's sex life or experiences, and repeated requests for dates, and the policy further provides that offenders are subject to remedial actions including termination. The purpose of the policy is to prohibit sexual harassment.

Appellant's App. p. 9. The Sexual Harassment Policy is a zero tolerance policy—employees who are found to have violated it are subject to immediate disciplinary action, including termination of employment. Employee Relations Manager S.N., who is directly responsible for enforcing the Sexual Harassment Policy, testified that the policy is necessary to ensure ACH's compliance with state and federal law and to protect employees of ACH and employees and inmates of the jails served by ACH from unwelcome sexual behavior. S.N. also testified that ACH uniformly enforces the Sexual Harassment Policy.

[3] M.W. began working for ACH as a nurse in June 2012. In October 2013, he was promoted to Interim Regional Nurse Manager, which was a supervisory position. As part of his employment, M.W. signed a form indicating that he had received and was aware of the Sexual Harassment Policy.

[4] On January 28, 2014, ACH received a complaint from Captain Jason Sloderbeck of the Hamilton County Jail. Captain Sloderbeck had received reports from five of his employees regarding inappropriate sexual comments that had been made by M.W. Following this complaint, ACH opened a full-scale investigation into M.W.'s conduct, interviewing ACH employees and

preparing a written record of those interviews. During the investigation, ACH uncovered at least seven additional instances in which M.W. had made inappropriate comments to ACH employees. In all, ACH received reports of unwelcome sexual comments by M.W. from twelve different people who worked for two different employers and worked at five different jail locations. On January 31, 2014, ACH terminated M.W.'s employment, having concluded that he had repeatedly violated the Sexual Harassment Policy.

[5]     M.W. filed a claim for unemployment insurance. The initial determination of the Department of Workforce Development was that he had been fired for just cause and was not eligible for unemployment insurance. M.W. appealed that determination. On May 1, 2014, an Administrative Law Judge (ALJ) held a telephonic hearing at which testimony was taken and evidence was submitted. S.N. testified for ACH, presenting evidence of M.W.'s violations of the Sexual Harassment Policy. Specifically, the following evidence was presented:

1.  Nurse J.R. reported that M.W. showed up at her home uninvited. He later sent her "a couple naked pictures." Appellant's App. p. 34.

2.  Officer K.W. had a conversation with M.W. in which M.W. commented about the "size and look" of another officer's breasts. *Id.* at 35.

3.  The officer about whose breasts M.W. had commented reported that on one occasion, she mentioned that she was craving chicken fajitas for lunch. M.W. laughed and, when another officer asked why he was laughing, said he thought she had said she was "craving some cock." *Id.* at 36.

4.  The same officer reported that on another occasion, M.W. came up behind her and whispered, "when did you get such a nice ass?" *Id.* That

officer said that there have been numerous other occasions "that have made me feel uncomfortable and as a result I have avoided him at all cost so as not to have to be put in that type of situation again." *Id.*

5. Nurse T.W. was giving medicine to an inmate who was talking with her, when M.W. commented to the inmate that T.W. "was his woman so he [the inmate] needed to stop talking to" T.W. *Id.* at 37. She reports that she has not felt comfortable around M.W. since this incident.

6. O.J. reported that she worked in the kitchen and that when M.W. was working, he would come and talk with her. M.W. asked her if she was married, and she said she was. He said that it did not matter. On another occasion, he asked her to go out for drinks, and she said no. He then said "No white man could ever handle [O.J.] the way that he could." *Id.* at 38.

7. K.H. said that M.W. told her that "if [her] husband isn't cuttin' it for [her], he could show [her] a few things." *Id.* at 40.

8. K.M. and J.M. both reported that he repeatedly questioned them about their personal lives and marriages in a way that made them uncomfortable. J.M. stated that M.W. is "completely convinced that I will one day sleep with him and that I will cheat on my husband with him." *Id.*

9. S.W. reported that M.W. was inappropriate and made personal comments that he should not have made. She stated that "he comes across [as] more flirtatious than your boss" and that he made her feel uncomfortable. *Id.* at 41.

10. J.H. reported that an inmate told her that M.W. had asked the inmate to perform oral sex.

11. M.N. stated that she told M.W. that she needed time off of work to get a mammogram and his response was that she did not need to make a doctor's appointment because he could have done the mammogram for her. M.N. felt very uncomfortable.

12. S.L. reported that M.W. frequently used very foul, profane, unprofessional language.

During the telephonic hearing, M.W. denied some of these allegations. He did not, however, deny allegations (2), (5), (7), or (9).[2]

On May 21, 2014, the ALJ issued a decision finding that ACH had not terminated M.W.'s employment with just cause. In pertinent part, the ALJ found as follows:

> . . . In connection with SW the employer alleges the claimant was flirtatious and made SW uncomfortable. The claimant and SW flirted with each other and the evidence is not persuasive SW was offended or uncomfortable, and the claimant's conduct involving SW did not constitute sexual harassment. . . .
>
> . . . The employer alleges that the claimant made a comment in reference to TW that TW was his "woman." An inmate made a statement that he would take TW as his woman, and the claimant and the inmate and TW were joking, and the claimant made a joking comment that TW was already his woman, and TW laughed and was not offended, and the claimant's conduct did not constitute sexual harassment. . . . The employer references an incident of a male, KW, and the claimant having conversation regarding K's breasts, and such comments were not made in the presence of K and the evidence is not persuasive that such comments constituted sexual harassment. The employer references an alleged comment by the claimant to KH to the effect that the claimant could take care of KH in a sexual manner if her husband could not and could show her a few things, and the claimant did not make the alleged comments. The claimant and KH did speak

---

[2] The Board emphasizes the hearsay nature of the complainants' allegations. We note, however, that M.W. did not object to the admission of any of the allegations into evidence, and that his own testimony corroborates several of the allegations. And in any event, the admission of hearsay evidence in an administrative hearing is proper. *See, e.g.*, *McHugh v. Review Bd. of the Ind. Dep't of Workforce Dev.*, 842 N.E.2d 436, 441 (Ind. Ct. App. 2006).

of her husband not having a job and the claimant indicated that if KH wanted he could pay her bills and live with her, and the evidence is not persuasive KH was offended and the evidence is not persuasive that such comments constituted sexual harassment.

Appellant's App. p. 8. The ALJ believed M.W.'s denials of the remaining allegations. Without explanation, the ALJ found that ACH employee S.N.'s testimony about the Sexual Harassment Policy "is to an extent lacking in credibility" and "is not persuasive the policy has been uniformly enforced." *Id.* at 9.

[7] ACH appealed the ALJ's decision to the full Board. The Board affirmed with a two-to-one vote. The dissenting chairperson of the Board wrote as follows:

> At the hearing before the [ALJ], the Claimant denied that he made some of the statements the Employer alleged that he made but also testified that he did not recall making some of the statements . . . . The Employer provided evidence of more than ten different instances of harassment. I do not find the Claimant's testimony credible that he did not harass any of the complainants. I would reverse the [ALJ] to conclude that the Employer discharged the Claimant for just cause.

*Id.* at 2-3. ACH now appeals.

# Discussion and Decision

[8] In Indiana, an employee is not eligible for unemployment benefits if he was discharged for good cause. Ind. Code § 22-4-15-1. Just cause for discharge includes the knowing violation of a reasonable and uniformly enforced rule of an employer. I.C. § 22-4-15-1(d).

[9] ACH challenges the Board's decision as being contrary to law. In considering such a challenge, we must review the sufficiency of the facts found to sustain

the decision and the sufficiency of the evidence to sustain the findings of fact. I.C. § 22-4-17-12(f). We apply a three-part standard of review: "(1) findings of basic fact are reviewed for substantial evidence; (2) findings of mixed questions of law and fact—ultimate facts—are reviewed for reasonableness; and (3) legal propositions are reviewed for correctness." *Recker v. Review Bd. of Ind. Dep't of Workforce Dev.*, 958 N.E.2d 1136, 1139 (Ind. 2011).

[10] Initially, we must emphasize that ACH is not required to prove that M.W. committed actionable sexual harassment such that the victims would be entitled to damages stemming from a civil lawsuit. *See* I.C. § 22-4-15-1(d) (providing that employee is discharged for just cause if he knowingly violated employer's policy); *Haegert v. Univ. of Evansville*, 977 N.E.2d 924, 937-38 (Ind. 2012) (finding that employee's claim based on his discharge for harassment was governed by the terms of his employment contract rather than Title VII of the Civil Rights Act or the Indiana Civil Rights Act). Instead, ACH must merely show that M.W. knowingly violated the Sexual Harassment Policy, which is reasonable and uniformly enforced.

[11] It is undisputed that M.W. knew of the Sexual Harassment Policy, inasmuch as he signed a document stating that he had received and was aware of it. Appellant's App. p. 32. It is also undisputed that the Sexual Harassment Policy is reasonable. The only things that remain to be determined, therefore, are whether M.W.'s conduct violated the policy and whether the policy is uniformly enforced.

[12] Regarding M.W.'s conduct, he did not deny and/or did not recall four of the allegations. Those allegations were as follows:

- Officer K.W. had a conversation with M.W. in which M.W. commented about the "size and look" of another officer's breasts. Appellant's App. p. 35.[3]

- Nurse T.W. was giving medicine to an inmate who was talking with her, when M.W. commented to the inmate that T.W. "was his woman so he [the inmate] needed to stop talking to" T.W. *Id.* at 37. She reports that she has not felt comfortable around M.W. since this incident.

- K.H. said that M.W. told her that "if [her] husband isn't cuttin' it for [her], he could show me a few things." *Id.* at 40.

- S.W. reported that M.W. was inappropriate and made personal comments that he should not have made. She stated that "he comes across [as] more flirtatious than your boss" and that he made her feel uncomfortable. *Id.* at 41.

[13] With respect to the discussion about the officer's breasts, the Sexual Harassment Policy explicitly prohibits "[l]ewd, off-color, sexually oriented comments or jokes" and "[s]exually oriented or explicit remarks, including written or oral references to sexual conduct, gossip regarding one's sex life, body, sexual activities, deficiencies, or prowess." *Id.* at 30-31. The ALJ found that this comment did not violate the policy because the officer whose body parts were being discussed was not present. That fact is irrelevant. The plain

---

[3] The Board pulls a single statement made by M.W. out of the transcript to argue that he denied that this conversation took place. When the entirety of his testimony is reviewed, however, it is apparent that he did not deny the conversation. Instead, he merely stated that he did not recall it. Tr. p. 35-36.

language of the policy prohibits explicit discussion about another person's private body parts, regardless of the presence of that person during the conversation. *Id.* Indeed, it is difficult to imagine a behavior more easily identifiable as sexual harassment than explicit comments about a colleague's body parts—whether or not she is present.

[14] With respect to M.W. referring to another nurse as "his woman" when speaking to an inmate, we refer to the same provisions of the policy discussed in the previous paragraph. Moreover, we note that the policy prohibits conduct that has the "effect of unreasonably creating an intimidating, hostile, or offensive working environment." *Id.* at 30. T.W. reported that following this incident, she has not felt comfortable around M.W., necessarily meaning that his comments created an intimidating, hostile, or offensive working environment for T.W. Although the ALJ found that M.W. was merely "joking" and that T.W. was not offended, the only evidence supporting this conclusion is M.W.'s own self-serving interpretation of T.W.'s behavior following the conversation. That does not constitute substantial evidence underlying this conclusion because the policy explicitly prohibits lewd jokes without reference to the reaction of the listener. We can only find that an explicit comment made to an inmate that a co-worker is the "woman" of the speaker violates the Sexual Harassment Policy.

[15] With respect to M.W.'s comments that if a co-worker's husband wasn't "cuttin' it for [her]," he could show [her] a few things," we note, again, that the Sexual Harassment Policy explicitly prohibits "oral references to sexual conduct" and

gossip regarding "one's sex life, body, sexual activities, deficiencies, or prowess." Appellant's App. p. 31, 40. During the telephonic hearing, M.W. said that in making this statement, he "jokingly said I can take care of you if he don't, if he don't wanna do it." Tr. p. 36. He clarified that he meant, "[l]ike, you know, paying the bills, living with her, whatever she wanted." *Id.* K.H. stated that his comments made her "stop and be like, what? . . . I mean, how do you respond to that? I was just like, well, alright, whatever." Appellant's App. p. 40. The ALJ found that the comments did not violate the policy and that K.H. was not offended. We cannot agree. It is readily apparent that in making this comment, M.W. intended to refer to K.H.'s sex life and his own prowess. Indeed, he admitted that he intended to mean "living with her" as one of the references of his comment. K.H. stated that she was taken aback by the comment and did not know how to respond, and there is no evidence in the record to dispute that aside from M.W.'s own self-serving statement that she was not offended. This behavior clearly violates the Sexual Harassment Policy.

[16] Finally, M.W. admitted that he flirted with S.W., merely stating that it was mutual. It is undisputed that at the time of the flirtation, he was S.W.'s supervisor. Moreover, S.W. stated that his comments were inappropriate and made her feel uncomfortable. The Sexual Harassment Policy prohibits

> verbal or physical conduct of a sexual or otherwise offensive nature, especially where . . . [s]ubmission to such conduct is made either explicitly or implicitly a term or condition of employment . . . and/or [s]uch conduct has the purpose or effect of unreasonably creating an intimidating, hostile, or offensive working environment.

*Id.* at 30. Inasmuch as M.W. was S.W.'s supervisor at the time he was making inappropriate comments, S.W. could reasonably have inferred that her submission to his comments was a condition of her employment with ACH. Furthermore, his comments unquestionably created an intimidating, hostile, or offensive working environment within the meaning of the policy. The ALJ found that the flirtation was mutual, that S.W. was not offended or uncomfortable, and the conduct did not violate the Sexual Harassment Policy. The only evidence supporting this conclusion is M.W.'s own self-serving interpretation of S.W.'s behavior, which does not constitute substantial evidence. A supervisor flirting with a subordinate and making inappropriate and overly personal comments to the subordinate unquestionably violates the Sexual Harassment Policy.

[17] As noted above, M.W. did not deny that these four interactions occurred. There is virtually no evidence in the record supporting the ALJ's conclusion that these four instances did not constitute violations of ACH's Sexual Harassment Policy. We also note our reluctance to accede to the ALJ's decision to discredit and disbelieve each and every one of the eleven complainants. We also note our surprise, in this day and age, that a judicial officer would find that if the speaker is merely joking, or if the person about whom the speaker is making lewd comments is not present, that such actions do not violate a sexual harassment policy. All of that said, the four instances that M.W. did not deny clearly violate both the spirit and letter of ACH's sexual harassment policy.

[18] As to whether the policy was uniformly applied, the uncontroverted evidence in the record establishes that it was. Specifically, ACH employee S.N., the human resources officer personally responsible for enforcing the policy, testified that the policy is uniformly enforced. Tr. p. 16. She also testified that the complaints regarding M.W. were the first complaints ACH has received regarding violations of the Sexual Harassment Policy in the previous five years. *Id.* The ALJ concluded, without explanation, that S.N.'s testimony lacked credibility. Nothing in the record supports that conclusion. The ALJ also concluded that her testimony was not persuasive that the policy had been uniformly enforced. Nothing in the record supports that conclusion either.

[19] Given the undisputed evidence in the record, the only reasonable conclusion to draw is that the Sexual Harassment Policy has, in fact, been uniformly enforced by ACH. Nothing in the record remotely tends to show that the Sexual Harassment Policy was applied arbitrarily to M.W. The mere fact that ACH has received no other complaints of violations of the policy in the previous five years does not constitute evidence undermining the uniformity of the policy's enforcement.

[20] We note, again, that ACH was not required to prove that M.W. committed actionable sexual harassment, and we have not made any findings in that regard in this opinion. As aptly noted by ACH, it should not have to wait until M.W.'s actions became so egregious that they *were* legally actionable to terminate his employment. Instead, ACH was merely required to show that M.W. was terminated for just cause; specifically, that he was terminated for

violating the Sexual Harassment Policy. We find that the Board erred by concluding that M.W. was not fired for just cause.

[21] The judgment of the Board is reversed.

Vaidik, C.J., and Riley, J., concur.