In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

Nos. 18-2559 & 18-2579

OLIVER COLLINS,

*Plaintiff-Appellee, Cross-Appellant*,

*v.*

UNIVERSITY OF NOTRE DAME DU LAC,

*Defendant-Appellant, Cross-Appellee*.

———————————

Appeals from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:10-CV-281 — **Joseph S. Van Bokkelen**, *Judge*.

———————————

ARGUED JANUARY 16, 2019 — DECIDED JULY 12, 2019

———————————

Before BAUER, ROVNER, and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. Plaintiff Oliver Collins was a tenured professor of electrical engineering at the University of Notre Dame. In 2010, a faculty committee found after a hearing that Dr. Collins had misused grant money by purchasing equipment other than that in his grant proposals and then using the equipment for personal purposes. The committee concluded that his actions warranted "dismissal for serious cause" under the Academic Articles incorporated in Dr.

Collins's faculty contract. At the end of the university's internal review processes, the president of Notre Dame ultimately dismissed Dr. Collins, who later pleaded guilty to a federal felony charge arising from his conduct.

Before the criminal charges were filed, however, Dr. Collins filed this suit against Notre Dame alleging that it breached his contract by dismissing him. In 2012, before his guilty plea, the district court granted summary judgment for Dr. Collins on liability on the theory that Notre Dame breached the contract by allowing one faculty member both to play a role in the informal mediation process and then to serve on the hearing committee. The court did not decide whether the faculty committee's findings added up to sufficient cause to dismiss a tenured faculty member like Dr. Collins.

Following Dr. Collins's 2013 guilty plea to a federal felony charge for theft of government grant funds in this same conduct, Notre Dame re-did Dr. Collins's adjudication and dismissed him again so as to establish a "damage cutoff date" in light of the district court's finding of a procedural error in the first adjudication. After the guilty plea, the court held to its earlier finding that Notre Dame had breached the contract by the procedural error. After a court trial on damages, the court awarded Dr. Collins $501,367, calculated as his lost compensation from the date of his dismissal on June 2, 2010 until the date of his felony conviction on February 28, 2013. Notre Dame has appealed, and Dr. Collins has cross-appealed on the amount of damages and other issues. We reverse both the district court's grant of summary judgment to Dr. Collins and the award of damages. The contract did not prohibit one faculty member from participating in informal mediation and

then serving on the hearing committee. Further, the undisputed facts show "serious cause" sufficient to warrant Dr. Collins's dismissal. Notre Dame is entitled to judgment in its favor.

I.  *Factual & Procedural Background*

Dr. Collins started teaching at Notre Dame in 1995 and became a tenured professor of electrical engineering in 2001. Upon receiving tenure, Dr. Collins signed a faculty contract, which was "subject to the provisions of the University of Notre Dame *Academic Articles* and any future amendments thereto." In the faculty contract, Notre Dame "reserves the right to terminate the services of any member of the faculty for serious cause" and explains that the "definition of serious cause and the procedures for establishing it … are set out in the Academic Articles." The Academic Articles define "serious cause" to include conviction of a felony:

> "Serious cause" consists of any of the following: academic dishonesty or plagiarism; misrepresentation of academic credentials; professional incompetence; continued neglect of academic duties, regulations, or responsibilities; conviction of a felony; serious and deliberate personal or professional misconduct (including, but not limited to sexual harassment or discrimination in violation of University policies); continual serious disregard for the Catholic character of the University; or causing notorious and public scandal.

Academic Articles, Article III, § 8(b).

In 2002, Dr. Collins applied for and received $266,516 from the National Science Foundation ("NSF") to purchase five pieces of "high speed, mixed signal test equipment" and a computer as part of a Major Research Instrumentation ("MRI") grant. Notre Dame contributed matching funds. NSF later awarded Dr. Collins $240,000 to support a project titled Intrinsically Digital Radios. As part of that project, he proposed to use $20,000 to purchase a signal generator. Notre Dame also contributed matching funds to that project.

In 2009, Notre Dame started to suspect that Dr. Collins was abusing his grants by purchasing equipment different from that identified in his proposals and by using the equipment for personal purposes. Notre Dame hired outside counsel to investigate and also informed the NSF. The NSF investigated separately. It suspended Dr. Collins's grants and referred the matter to the Department of Justice, leading eventually to Dr. Collins's guilty plea to felony theft from a program receiving federal funds, in violation of 18 U.S.C. § 666. In the meantime, in August 2009, Notre Dame President Rev. John Jenkins suspended Dr. Collins with pay pursuant to the Academic Articles.

In September 2009, Vice President and Associate Provost Donald Pope-Davis sent Dr. Collins a letter pursuant to Article III, Section 8 of the Academic Articles, addressing "Severe Sanctions and Dismissal for Serious Cause." The letter listed six charges:

> 1. Used NSF funds to purchase equipment significantly different than the equipment specified in the grant documents, and that you did this on more than one grant, and over the course of several years;

2. Failed to inform NSF of the nature of the equipment you purchased;

3. Submitted a final report under one grant in which you falsely indicated that grant funds were used as intended;

4. Used equipment purchased with NSF funds for extensive personal purposes, with negligible if any scientific use of the equipment;

5. Took and stored sexually explicit and pornographic images using University computing resources; and

6. Failed to exercise care in maintaining University equipment, including University equipment purchased with government funds.

The letter further asserted:

Your actions were dishonest and constitute serious and deliberate misconduct of both a personal and professional nature. Moreover, you have exhibited serious disregard for the Catholic character of the University; and you have exposed the University to notorious and public scandal, all of which, we believe, warrants the sanction of dismissal from the University.

Finally, the letter informed Dr. Collins that the Office of the Provost intended to initiate election of a hearing committee to review the case and that, in the meantime, Dr. Collins was invited to attempt an informal resolution of the matter with Dr. Pope-Davis.

Dr. Pope-Davis discussed informal resolution with Dr. Collins by telephone. When that did not lead anywhere, Dr. Pope-Davis appointed two faculty members—Father John Coughlin and Dr. Paul Huber—to meet with Dr. Collins and "the relevant University administrator" "to attempt to resolve the issue to their mutual satisfaction." After a telephone call with Dr. Collins, Father Coughlin and Dr. Huber informed Dr. Pope-Davis of the recommendations Dr. Collins made for resolving the matter. On December 22, 2009, Dr. Pope-Davis informed Dr. Collins by letter that none of his recommendations were acceptable and Notre Dame would initiate the hearing process.[1]

Section 8(c)(3) of the Academic Articles sets forth the procedure for selecting the hearing committee:

> The Executive Committee of the Academic Council elects a Hearing Committee of three elected, tenured members of the Academic Council to conduct a formal, closed-door hearing. The Executive Committee also elects an alternate (who must also be an elected, tenured member of the Academic Council) to take the place of any member elected to the Hearing Committee who must recuse himself or herself because of bias or interest, including

---

[1] Dr. Collins had recommended that Notre Dame: (1) remove the suspension and allow him to find a new faculty position, while continuing to pay his salary for a period of time; (2) pause Notre Dame's process until the NSF completed its investigation; or (3) allow Dr. Collins to take an unpaid position at another university while Notre Dame continued to pay his salary for a period of time.

> participation in the informal resolution process set forth above.

The Executive Committee selected Dr. Laura Carlson, Father Coughlin, and Dr. Graham Lappin for the hearing committee, with Dr. Huber as the alternate.

The hearing occurred on April 27, 2010. On April 30, 2010, the hearing committee issued its report. The committee sustained charges 1, 2, and 6 in full and sustained charges 3, 4, and 5 in part:

> Charge #1: "Used NSF funds to purchase equipment significantly different than the equipment specified in the grant documents, and that you did this on more than one grant, and over the course of several years;"
>
> *Vote*:
>
> The committee votes unanimously (3–0) that the charge is sustained by clear and convincing evidence.
>
> *Factual findings*:
>
> With respect to the Major Research Instrumentation grant (Exhibit 10), the committee determines that the items listed in the original proposal and then appearing in the revised budget were not purchased using NSF funds as specified. Part of the cost of these items was shifted to another source of funding (Exhibits 13 & 14), with $161,231 from the MRI grant going to budgeted items. In addition, NSF funds were diverted to non-budgeted purchases pursuant to

the terms of the grant (cameras and computing equipment and accessories, $240,115, Exhibits 15 & 16). The non-budgeted purchases are disconnected from the scope and objectives of the grant, and should have received authorization from NSF.

With respect to the Digitally Intrinsic Radio grant (Exhibit 18), the committee determines that the principal piece of equipment (signal generator) that was budgeted was not purchased. Instead, funds were diverted to non-budgeted purchases pursuant to the terms of the grant (cameras and computing equipment and accessories, $42,730, Exhibits 25 & 26). A negative implication of this change is that the proposed equipment was not available for research and teaching as presented in the broader impact statement of the NSF proposal.

Charge #2: "Failed to inform NSF of the nature of the equipment that you purchased;"

*Vote*:

The committee votes unanimously (3–0) that the charge is sustained by clear and convincing evidence.

*Factual findings*:

The record shows that Professor Collins failed to contact and inform NSF about the non-budgeted equipment ($282,845) that was purchased from the MRI and Digitally Intrinsic Radio grants.

Charge #3: "Submitted a final report under one grant in which you falsely indicated that grant funds were used as intended;"

*Vote*:

By a unanimous vote (3–0) the committee is unable to determine whether the report was intentionally false. However, by a unanimous vote (3–0) the committee finds that the final report failed to provide an adequate account of how the grant funds were used.

*Factual findings*:

The committee determines that Professor Collins was negligent in the preparation of the final report for the MRI NSF grant. The report (Exhibit 17) fails to contain a list of the equipment purchased. The committee found the photographs of the laboratory equipment in the final report to be misleading.

Charge #4: "Used equipment purchased with NSF funds for extensive personal purposes, with negligible, if any scientific use of the equipment;"

*Vote*:

By a unanimous vote (3–0) the committee finds that there was some personal use of this equipment. Moreover, there was a lack of documentation supporting a scientific use of this equipment.

*Factual findings*:

Professor Collins took and stored thousands of photographic images (some of a personal nature, Exhibits 28–34) using cameras and computers purchased under NSF grants (Exhibits 15, 16, 25 & 26). At the hearing and in the respondent's written statement, Professor Collins asserted that the use of the equipment was justified as part of his investigation to create a database for list decoding. However, the committee was not presented with a formal record originating from Professor Collins' laboratory supporting the scientific use of the equipment.

Charge #5: "Took and stored sexually explicit and pornographic images using University computing resources;"

*Vote*:

By a unanimous vote (3–0), the committee does not find by clear and convincing evidence that Professor Collins took sexually explicit and pornographic images. However, by a unanimous vote (3–0) the committee finds by clear and convincing evidence that sexually explicit and pornographic images were stored on University computers for which he was responsible.

*Factual findings*:

Sexually explicit and pornographic images were found on at least 4 University computers for which Professor Collins was responsible (Laptops L3 and L4; Desktops D1 and D4).

The meta-data indicate that some of the sexually explicit and pornographic images were taken with a Canon EOS IDs camera purchased from the NSF MRI grant (Exhibits 15 & 29). In addition, the committee found a number of discrepancies about the images allegedly taken on 10/16/2006:

> 1. In the respondent's written statement, it states that "*On October 16, 2006 the camera was either being serviced or had already been dropped off in a NY office where it was waiting for Dr. Collins to pick it up*".

> 2. The committee noted that Professor Collins asserted in the hearing and in the respondent's written statement that he was in Washington, DC on 10/16/2006, but did not present any persuasive evidence to support this assertion.

Charge #6: "Failed to exercise care in maintaining University equipment, including University equipment purchased with government funds."

*Vote*:

The committee votes unanimously (3–0) that the charge is sustained by clear and convincing evidence.

*Factual findings*:

> The record shows that there were a number of computers purchased with NSF grant money that can no longer be located. The University policy about disposal of equipment was not properly followed.

> Cameras that were in Professor Collins' care and under his responsibility were used to take sexually explicit and pornographic images. Computers that were in Professor Collins' care and under his responsibility contained sexually explicit and pornographic images.

The committee concluded unanimously that Dr. Collins should be dismissed for "serious cause" that had been shown by clear and convincing evidence.

At the next step of the process, under § 8(c)(3) of the Academic Articles, Dr. Pope-Davis confirmed Dr. Collins's dismissal for serious cause.[2] Under § 8(c)(4), Dr. Collins then appealed to the president of the university. The president first directed the Executive Committee to choose an Appeal Board of "three tenured members of the Academic Council, none of whom served on the Hearing Committee." The Executive Committee chose Professor Anthony Bellia, Jr., Dr. William Nichols, and Dr. Joseph Powers. The Appeal Board reviewed the written record and transcript of the hearing and unanimously concluded that "record evidence sufficiently supports

---

[2] Dr. Pope-Davis was the associate provost, and the Articles provide that the provost makes this decision. Art. III, § 8(c)(3). The Academic Articles also, however, allow associate and assistant provosts to perform duties and exercise authority delegated by the provost. Art II, §§ 1 & 2.

the Hearing Committee's factual findings on each of the six charges" and that "adequate cause exists for the sanction of dismissal." On June 2, 2010, President Jenkins informed Dr. Collins that he accepted the Appeal Board's findings and dismissed him immediately for serious cause.

In July 2010, invoking federal jurisdiction based on diversity of citizenship, Dr. Collins filed this suit against Notre Dame for breach of contract. The parties filed cross-motions for summary judgment on a stipulated record containing the official transcript and exhibits to the faculty committee hearing. In his motion, Dr. Collins argued that Notre Dame breached his contract because the hearing committee's findings did not meet the definition of "serious cause." In its motion, Notre Dame argued that the court should defer to its decision because it followed the contractual procedures and the hearing committee's findings were supported by substantial evidence. Notre Dame also argued that in any event, undisputed facts showed "serious cause" under § 8(a) of the Academic Articles. In reply in support of his summary judgment motion, Dr. Collins argued for the first time that Notre Dame had violated the contract's procedural requirements. He argued that Father John Coughlin's service as hearing committee chair "unduly biased" the committee's process and decision because he had also participated in the informal mediation effort. Dr. Collins argued that § 8(c)(3) of the Academic Articles requires a member of the hearing committee who participated in informal mediation to recuse himself.[3]

---

[3] The parties disputed in the district court and on appeal whether Dr. Collins had raised a timely objection to Fr. Coughlin's participation on the hearing committee. Because we decide the appeals on different grounds,

In May 2012, the court granted summary judgment to Dr. Collins on the procedural issue, explaining: "Under the plain language of the contract, a Hearing Committee member must recuse himself if he takes part in informal dispute resolution procedures." The court did not decide whether there was "serious cause" for dismissal.

This civil case proceeded, and the court explained at the next status conference that it did not intend to rule on the issue of "serious cause" because the ruling on the procedural issue made that unnecessary. In October 2012, Dr. Collins pleaded guilty to 18 U.S.C. § 666. In his allocution in support of his guilty plea, Dr. Collins stated:

> I purchased a camera valued at over $5,000 in United States Currency in July of 2005 with funds granted by NSF for a science project through the University of Notre Dame. The project had received over $10,000 in United States Currency in a one year period under the grant. This camera was purchased by myself for personal, professional use, and to assist myself on the grant work. However, the camera was not part of the approved grant or project approved by the NSF nor did I get approval to use the camera for personal matters.

In a March 2013 status conference in the civil case, Notre Dame argued that since Dr. Collins had admitted that his conduct constituted a felony, "we know to a certainty that … any procedural defect … doesn't change the outcome on the

---

we do not resolve this issue but merely assume there was a timely objection.

substance." The court adhered to its view that the procedural breach meant that the decision made by the hearing committee in 2010 was void, regardless of the merits.

Later in March 2013, the court issued an order saying that the procedural breach meant that Dr. Collins had been wrongfully terminated. In an order in November 2013, the court again explained that it "did not deem it appropriate to review the merits of Notre Dame's decision to dismiss Collins because the composition of the Hearing Committee whose findings were the cornerstone of the decision violated Notre Dame's Academic Articles, thereby tainting the decision." Notre Dame then conducted a second adjudication of Dr. Collins's case to establish a "damage cutoff date" if the first adjudication were ultimately deemed void because of the procedural issue. A new hearing committee unanimously found "serious cause" to dismiss Dr. Collins given his guilty plea and the conduct that was the subject of the first adjudication. In January 2014, Provost Thomas G. Burish informed Dr. Collins that, upon review of the documents upon which the hearing committee relied, clear and convincing evidence of serious cause warranted the termination and maintained the sanction of dismissal.

After a bench trial on damages, the court issued findings of fact and conclusions of law. The court found that "a number of items that were not in the budget for either grant were purchased with MRI grant funds" and that Dr. Collins "used some of the camera equipment to take pictures that he said he needed to establish a statistical database" but "never explained … how the database supported the research specified in his NSF grants," that Dr. Collins took "pictures of nude models" "with MRI grant equipment" and "submitted

pictures of Innisfree Garden that he took with that equipment to commercial publications such as Conde Nast," that Dr. Collins "did not seek or receive permission from anyone at Notre Dame to take the camera equipment he bought on the MRI grant away from the campus or to make personal use of the equipment," and that Dr. Collins "was not able to locate and return to Notre Dame all of the equipment he bought with the MRI grant."

As for damages, the court rejected Notre Dame's argument that the procedural breach found by the court was not material. The court wrote that it was "impossible to know what would have happened if someone other than Fr. Coughlin had served on the Committee." The court then found that Dr. Collins was entitled to lost compensation from the date of his dismissal from Notre Dame on June 2, 2010, until the date of his felony conviction on February 28, 2013. The court awarded $501,367 to Dr. Collins.

On appeal Notre Dame argues that the district court erred: (1) in its summary judgment ruling that Notre Dame breached the contractual procedure by allowing Father Coughlin to serve in the informal mediation and on the hearing committee; (2) by ruling that Dr. Collins was wrongfully terminated because of the procedural breach even though there was "serious cause" to fire him; and (3) by awarding Dr. Collins damages even though he did not show that the supposed breach caused the damages he claimed. In his cross-appeal, Dr. Collins argues the district court erred: (1) by cutting off his damages upon his conviction and failing to award damages of at least $4,995,495, the amount he claims he would have earned until his retirement; (2) by dismissing his constructive fraud claim, that Notre Dame had been in a superior position

regarding grant administration and he had relied on Notre Dame's advice; and (3) by not allowing him to amend his complaint a month before trial to add counts of negligence and negligent misrepresentation, as well as a claim under Indiana's Wage Claim Statute.

II. *Discussion*

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We review the legal conclusions of summary judgment rulings de novo, construing all evidence and drawing all reasonable inferences in favor of the non-moving party. *Roberts v. Columbia College Chicago*, 821 F.3d 855, 861 (7th Cir. 2016).

The district court's damage award to Dr. Collins depends entirely on the court's finding that Father Coughlin's participation in the hearing committee violated § 8(c)(3) of the Academic Articles. That section, after requiring the executive committee to choose a hearing committee, states: "The Executive Committee also elects an alternate … to take the place of any member elected to the Hearing Committee who must recuse himself or herself because of bias or interest, including participation in the informal resolution process set forth above." The proper reading of this sentence is that "bias or interest" warrants recusal, and that while participation in the informal resolution process *may* give rise to bias or interest, it does not necessarily do so. This section did not require Father Coughlin's recusal from the hearing committee, as nothing in the record shows that he had any bias or interest in Dr. Collins's proceeding.

And while the district court did not reach the substantive issue, the undisputed facts show "serious cause" to dismiss Dr. Collins. Notre Dame was on firm ground when it determined that his actions fell within § 8(b)'s definition of "serious cause." The hearing committee's report set out detailed findings on six charges—sustaining three in full and three in part—and recommended dismissal for serious cause. The appeal board unanimously affirmed the hearing committee's decision. If the evidence of wrongdoing in the hearing record were not clear enough, Dr. Collins later pleaded guilty to a felony arising from this same conduct. The undisputed evidence thus shows "serious cause" sufficient as a matter of law to support dismissal. We are not receptive to Dr. Collins's attempts to blame Notre Dame for his conduct.[4] Because Notre Dame did not breach procedural requirements in the contract, and because Dr. Collins's actions clearly constitute "serious cause" warranting dismissal under the Academic Articles, we reverse.

A. *Procedural Issue*

To prevail on a breach of contract claim, a plaintiff "must prove the existence of a contract, the defendant's breach of that contract, and damages resulting from the breach." *Haegert v. University of Evansville*, 977 N.E.2d 924, 937 (Ind. 2012). The record here does not show a procedural breach of Dr. Collins's contract with Notre Dame.

The Indiana "rules governing the construction, interpretation, and breach of contracts govern this action, and we will

---

[4] Dr. Collins attempts at length to blame Notre Dame's grant approval process for his criminal misconduct. This effort at blame-shifting is not persuasive.

go outside the terms of the relevant contract only when absolutely necessary." *Id.* The contract at issue here is Dr. Collins's tenure faculty contract, which incorporates Notre Dame's Academic Articles.

In interpreting the provision on selection of the hearing committee, "clear and unambiguous language is given its ordinary meaning." *Ryan v. TCI Architects/Engineers/Contractors, Inc.*, 72 N.E.3d 908, 914 (Ind. 2017). The Indiana Supreme Court has explained:

> "Indiana courts recognize the freedom of parties to enter into contracts and, indeed, presume that contracts represent the freely bargained agreement of the parties." *Fresh Cut, Inc. v. Fazli*, 650 N.E.2d 1126, 1129 (Ind. 1995). Thus, when the terms of a contract are drafted in clear and unambiguous language, we will apply the plain and ordinary meaning of that language and enforce the contract according to those terms. *Sheehan Const. Co., Inc. v. Cont'l Cas. Co.*, 935 N.E.2d 160, 169 (Ind. 2010). This approach best effectuates the primary goal in appellate review of contract cases: "to ascertain and give effect to the mutual intention of the parties." *Hutchinson, Shockey, Erley & Co. v. Evansville–Vanderburgh Cnty. Bldg. Auth.*, 644 N.E.2d 1228, 1231 (Ind. 1994). This also makes contract cases particularly suited for summary judgment.

*Haegert*, 977 N.E.2d at 937.

The decisive issue here is whether *any* participation by a faculty member in the informal resolution process

*automatically* requires recusal from a hearing committee. Again, the provision reads: "The Executive Committee also elects an alternate … to take the place of any member elected to the Hearing Committee who must recuse himself or herself because of bias or interest, including participation in the informal resolution process set forth above."

Linguistically, the key is the link between the phrase "bias or interest" and the following clause, "including participation in the informal resolution process." Neither the language nor the grammatical structure of that sentence makes plain whether participation in the informal resolution process *necessarily* amounts to "bias or interest" or instead merely *may* result in bias or interest. The district court found that this language requires automatic recusal by any member of the hearing committee who participated at all in informal efforts to resolve the dispute. That is a permissible reading of that provision, at least in isolation. With respect, though, we disagree with our colleague on the district court, primarily because of other textual signals in closely related provisions in the Academic Articles. Those provisions persuade us that the better reading is that, if participation in the informal process led to bias or interest, then the hearing committee member must recuse, but that recusal is not automatic without actual bias or interest or at least a substantial risk of bias or interest.

When analyzing contractual language, "we accept an interpretation of the contract that harmonizes all its provisions." *Ryan*, 72 N.E.3d at 914, citing *Kelly v. Smith*, 611 N.E.2d 118, 121 (Ind. 1993); see also *Trustees of Indiana University v. Cohen*, 910 N.E.2d 251, 258 n.6 & 259 n.10 (Ind. App. 2009) (granting summary judgment to university and interpreting provisions of terminated professor's employment contract in

manner that harmonized its provisions as a whole); *Vincennes University ex rel. Board of Trustees of Vincennes v. Sparks*, 988 N.E.2d 1160, 1167 (Ind. App. 2013) (granting summary judgment to university and interpreting terminated basketball coach's employment contract in manner that harmonized provisions regarding tenure and a zero-tolerance misconduct policy); *Vesuvius USA Corp. v. American Commercial Lines LLC*, 910 F.3d 331, 334 (7th Cir. 2018) (applying Indiana law and noting potential "linguistic inconsistencies" in specific provision, but explaining that when court construed contract as a whole, proper interpretation was clear); Restatement (Second) of Contracts § 202 (1981) ("Words and other conduct are interpreted in the light of all the circumstances," and "A writing is interpreted as a whole").

We have explained in a case applying Illinois law that "when parties to the same contract use such different language to address parallel issues …, it is reasonable to infer that they intend this language to mean different things." *Taracorp, Inc. v. NL Industries, Inc.*, 73 F.3d 738, 744 (7th Cir. 1996) (different contractual language in indemnification obligations regarding two different facilities supported inference that provisions had different meanings). This is a common, if not automatic, presumption in interpreting both contracts and statutes. See, e.g., *Vendura v. Boxer*, 845 F.3d 477, 485 (1st Cir. 2017) (different language in parallel ERISA plan provisions on accrual of years of service signaled different meanings); *Great American Ins. Co. v. Norwin School Dist.*, 544 F.3d 229, 246 (3d Cir. 2008) (different language in different retainage provisions in construction contract signaled different meanings); *Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151, 1156–57 (10th Cir. 2007) ("When a contract uses different language in proximate and similar provisions, we commonly understand

the provisions to illuminate one another and assume that the parties' use of different language was intended to convey different meanings."); see also *Right Field Rooftops, LLC v. Chicago Cubs Baseball Club, LLC*, 870 F.3d 682, 690 (7th Cir. 2017) (applying similar reasoning to parallel provisions in agreement regarding expansion of bleachers near Wrigley Field); *Frew v. Janek*, 820 F.3d 715, 729 & n.60 (5th Cir. 2016) (similar reasoning to interpret parallel provisions in consent decree).[5]

Other provisions in the Academic Articles address parallel issues regarding who may participate in decisions to revoke, grant, or deny tenure. Those provisions impose explicit and automatic requirements of recusal or non-participation in tenure decisions, using unmistakably clear language. For example, with respect to a committee that reviews a decision on reappointment, promotion, or tenure, Article III, § 6(a) provides: "Any person who has had prior involvement with the case, either directly or indirectly, must recuse himself or herself." And in § 8(c) itself, the subsection on appeals specifies that the Appeal Board shall consist of three tenured members

---

[5] Contract interpretation bears many similarities to statutory interpretation, and in that context the Supreme Court has "often noted that when 'Congress includes particular language in one section of a statute but omits it in another' … this Court 'presume[s]' that Congress intended a difference in meaning." *Loughrin v. United States*, 573 U.S. 351, 358 (2014), quoting *Russello v. United States*, 464 U.S. 16, 23 (1983). Our decision in *Taracorp* and other cases cited above drew on principles of statutory interpretation to support this inference of different meaning from different language. As noted, however, the inference is not automatic. See *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341–42 (1997) (use of different and clearer language in other provisions of Civil Rights Act of 1964 did not require different meaning for scope of retaliation prohibition that would undermine protection of former employees from retaliation).

of the Council, "none of whom served on the Hearing Committee."[6] It would be odd to treat the very different language in § 8(c)(3) as equivalent to these strong, clear, and automatic rules, at least when there is another sensible reading that focuses more on the issue of bias or interest, rather than to impose an automatic rule of recusal.

The better interpretation is that § 8(c)(3) requires recusal based on informal mediation only if there is actual bias or interest. There is no evidence in the record of any actual bias or interest on the part of Father Coughlin arising from his role in the informal mediation or anything else. As best we can tell, Dr. Collins did not try to prove actual bias on the part of Father Coughlin, whether arising from the brief attempt at mediation or otherwise. Accordingly, we conclude that the undisputed facts show that Notre Dame complied with the contractual procedures in Dr. Collins's adjudication. There was no procedural breach of the contract in the 2010 dismissal. We must therefore reverse the judgment of the district court, which was based on an erroneous finding of such a procedural breach.

---

[6] We have observed that, in general, Indiana "courts have quite properly exercised the utmost restraint in applying traditional legal rules to disputes within the academic community." *Sung Park v. Indiana Univ. Sch. of Dentistry*, 692 F.3d 828, 831 (7th Cir. 2012), citing *Gordon v. Purdue Univ.*, 862 N.E.2d 1244, 1248 (Ind. App. 2007). Often, "literal adherence to internal rules will not be required where the dismissal rests upon expert judgments as to academic or professional standards." *Sung Park*, 692 F.3d at 831, citing *Neel v. Indiana Univ. Bd. of Trustees*, 435 N.E.2d 607, 612 (Ind. App. 1982). We need not rely on any sort of restraint or deference here since it is clear that Notre Dame complied with the contractual procedures.

B.  *Serious Cause*

The next question is whether Notre Dame was entitled to summary judgment on whether Dr. Collins's dismissal was substantively justified based on "serious cause." The district court did not decide this issue, but we conclude that Dr. Collins's guilty plea removes any ground that a judge or jury might have for disagreeing with Notre Dame's decision. Notre Dame's Academic Articles define "serious cause" to include serious and deliberate personal or professional misconduct, continual serious disregard for the Catholic character of the University, causing notorious and public scandal, and conviction of a felony. Article III, § 8(b). The undisputed facts here show that Dr. Collins's actions, as a matter of law, constituted "serious cause" to remove him. Further, Dr. Collins has now been convicted of a felony arising out of this course of conduct.[7]

The undisputed facts found in the hearing committee's findings fall squarely within the Academic Articles' definition of "serious cause." These facts show that Collins misrepresented his intended use of the grant funds, purchased equipment other than that listed in his grant proposals and used the equipment for unrelated purposes, stored pornographic images on computers that were improperly purchased using grant funds, and clearly exposed Notre Dame to notorious

---

[7] Tying into footnote 6, we have previously explained that courts "must not second-guess the expert decisions of faculty committees in the absence of evidence that those decisions mask actual but unarticulated reasons for the University's action." *Vanasco v. National-Louis Univ.*, 137 F.3d 962, 968 (7th Cir. 1998). However, we decide this dispute solely through the breach of contract lens, without giving the sort of deference we might in an academic dispute over whether to grant or deny tenure.

and public scandal. Dr. Collins later pleaded guilty to a felony arising from the grant problems. Given that a felony conviction is listed as an event that constitutes serious cause, we see no room for debate about whether his firing was substantively justified.

Since there was no procedural breach, and since there was "serious cause" as a matter of law, Notre Dame is entitled to summary judgment. Dr. Collins is entitled to no damages. Our ruling renders moot all of the issues in Dr. Collins's cross-appeal. Accordingly, that appeal is dismissed. The district court's judgment is REVERSED and the case is REMANDED with instructions to enter judgment in favor of Notre Dame.